JUDGE HOLWELL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------x

MARK B. PRICE,

                  Plaintiff,

    -against-

CUSHMAN & WAKEFIELD, INC. and
JOANNE PODELL,

                  Defendants.

------------------------------------------------------------------x

Civil Action No.

**COMPLAINT** 08 CIV 8900

OCT 16 2008

U.S.D.C. S.D.N.Y.
CASHIERS

        Plaintiff Mark B. Price ("Price"), by his attorneys, Reavis Parent Lehrer LLP, for his

Complaint herein against defendants Cushman & Wakefield, Inc. ("Cushman" or "C&W") and

Joanne Podell ("Podell"), alleges as follows:

## NATURE OF THE ACTION

        1.      This action is brought by plaintiff Price, a real estate broker who suffered from

intense religious discrimination while employed at Cushman, a real estate brokerage firm. While

his young son was suffering from a malignant brain tumor, and following his son's death, Price

became more religiously devout over time, associating with a branch of Judaism called Chabad.

During this time, defendant Podell was Price's immediate supervisor and a senior broker at

Cushman, and the two were parties to a commission-sharing agreement. Podell reacted with

deep antagonism to Price's more intense observance of Judaism, by openly disparaging his

beliefs and refusing to reasonably accommodate his religious observance. Price complained to

several supervisory personnel about Podell's actions but Cushman refused to investigate or

intervene.

2. Podell and Cushman's outrageous and escalating campaign of discrimination and harassment against Price included, among other things, the following: (1) refusing to accommodate his attendance at synagogue in the early morning hours (prior to the office hours for Cushman employees) and his modest religious displays at the office; (2) moving and physically isolating him from his department and discouraging support staff and other brokers from working with him; (3) refusing to investigate or act upon his complaints concerning the religious discrimination he was suffering; (4) refusing to pay him his share of hundreds of thousands of dollars in commissions that were contractually due to him; and (5) ultimately terminating him in retaliation for his complaints about the campaign of discrimination and harassment instituted against him, in violation of Cushman's own policies and procedures.

3. Price brings this action for unlawful discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 *et seq.*; the New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq.*: the New York City Civil Rights Law, § 8-101 *et seq.*; N.Y. Labor Law § 191 *et seq.* and the common law.

4. Moreover, Price seeks damages from defendants for breach of contract and/or unjust enrichment against Cushman and Podell for their failure to pay him commissions due to him in the amount of at least $650,000.

5. Price seeks damages sustained as a result of defendants' unlawful conduct in an amount to be proven at trial, but believed to be in excess of $5,000,000, as well as punitive damages in the amount of $5,000,000, attorneys' fees and interest.

## JURISDICTION AND VENUE

6. This court has subject matter jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1331 in that it involves a federal question under the employment discrimination laws of the

United States, particularly 42 U.S.C. § 2000 *et seq*. This Court has supplemental jurisdiction

over Price's state statutory claims and his common law claims under 28 U.S.C. § 1367(a)

because such claims arise from the same or closely related conduct of defendants.

      7.     Moreover, this Court also has subject matter jurisdiction over this lawsuit

pursuant to 29 U.S.C. § 1332 because there exists complete diversity between the parties and the

amount in controversy exceeds $75,000.

      8.     This Court has personal jurisdiction over defendants because: (i) defendant

Cushman's principle place of business is in the State of New York; (ii) defendant Podell resides

in the State of New York; (iii) defendants have transacted business in New York; (iv) defendants

regularly do and solicit business in New York; and (v) defendants intentionally acted in such a

way as to cause injury to plaintiff Price in New York.

      9.     Venue is proper in this district by virtue of 28 U.S.C. §§ 1391 (b) and (c), because

this is the judicial district in which a substantial part of the events or omissions giving rise to the

claim occurred; and because each of the defendants resides within the district.

### THE PARTIES

      10.    Plaintiff Price is an individual who resides at 85 Maria Drive, Hillsdale, New

Jersey 07642, and at all pertinent times was a licensed real estate broker in the State of New

York.

      11.    Upon information and belief, defendant Cushman is a corporation organized and

existing under the laws of the State of New York, whose principal place of business is located at

51 West 52nd Street, New York, New York 10019.

      12.    Upon information and belief, Cushman provides real estate brokerage services for

corporate and individual clients worldwide.

13.     Upon information and belief, defendant Podell is an individual employed by

Cushman who resides at 300 East 56th Street, New York, New York 10022, and at all pertinent

times was a licensed real estate broker in the State of New York.

## ALLEGATIONS COMMON TO ALL CLAIMS

### A.     Price's Initial Employment by Cushman and his Employment Contract

14.     Price is a fifty-year old (50) year-old, white, Jewish male citizen of the United

States.

15.     Price's employment with Cushman began in January 2003, when he was hired as

a real estate broker for Cushman's New York City office.

16.     On or about January 8, 2003, Price and Cushman executed a document entitled

"Broker-Salesperson Employment Contract" (the "Employment Contract"), a copy of which is

annexed as "Exhibit 1" hereto.

17.     Paragraph 3 of the Employment Contract provides for the payment of

commissions and fees to Price, and states, in pertinent part:

> C&W shall pay Employee and Employee accepts as his full and only compensation for
> all his services rendered, the percentages of the commissions and fees collected by C&W
> on transactions in which Employee has rendered services, under the circumstances and as
> determined in accordance with the Schedule of Compensation annexed hereto and made
> part hereof. . . .

18.     Paragraph 7 of the Employment Contract provides that Cushman would allocate

the payment of commissions to Price and any other brokers at Cushman participating in the real

estate transaction at issue:

> C&W shall at all times have the sole and absolute right to determine the commission or
> fee to be charged to any customer and the sole discretion to decide whether any
> transaction on which Employee has been working is consummated in whole or part by
> Employee's efforts. If any commissions or fees are determined to be due and C&W
> personnel other than Employee contributed to or assisted in consummating any such
> transaction, whether such other personnel are employed on a salary or commission basis,

4

Employee shall abide by and accept C&W's decision with respect to the determination of the amount of and the allocation of Employee's share in the commission or fee. . . .

19.    Paragraph 13(b) of the Employment Contract provides for the payment of fees for

transactions completed following a broker's termination, as follows:

Employee shall not be entitled to share in any commission or fees collected by C&W subsequent to the termination of Employee's employment, except under the following conditions.

(i)    If any transaction has been finally consummated prior to the termination of Employee's employment but the commission or fee is not collected or due until after the termination;

(ii)    If a contract of sale or escrow agreement has been fully and unconditionally executed and exchanged by and between the seller and purchaser prior to the termination of Employee's employment, and thereafter, a sale is consummated pursuant to the contract of sale or escrow agreement;

(iii)    If a duly authorized written offer to lease specifying the essential terms of a lease agreement, including the rental rate, size and location of premises, length of lease term and concessions and special conditions required has been made to a specifically identified landlord or tenant prior to the termination of Employee's employment and thereafter within a period of three months, a lease substantially in accordance with and pursuant to such offer is consummated.

20.    A "Schedule of Compensation" referred to in Paragraph 3 of the Employment

Contract was annexed to the Employment Contract, and was made a part thereof.

21.    Paragraph I.A of the Schedule of Compensation to the Employment Contract

provides, in pertinent part, that the "broker's share of gross commissions when, as and if

received by C&W in any calendar year is 50%, subject to the other applicable terms and

conditions set forth in this schedule."

22.    Article VII of the Schedule of Compensation provided for a preliminary dispute

resolution process and the internal arbitration of disputes concerning the allocation of

commissions as among brokers employed by Cushman (the "Dispute Resolution Procedures").

5

Cushman used these procedures in making its own determinations as to how commissions on transactions should be allocated among its employees.

23.     In particular, Paragraph VII.A of the Schedule of Compensation provides, with respect to the Dispute Resolution Procedures, in pertinent part:

> If a broker has a dispute with one or more other brokers, such broker will first seek to have the dispute resolved with the assistance of the appropriate Branch Manager(s) or Regional Director(s).  Every effort must be made to resolve the dispute at this level.  It is the responsibility of each Branch Manager and Regional Director to ensure that every effort has been made to resolve the dispute before beginning the arbitration process. . . .

24.     If this preliminary process fails, Paragraphs VII.B-G of the Schedule of Compensation provides for an internal arbitration process.  Under such procedures, where the dispute involves more than $100,000 in gross commissions, Cushman is required to appoint a panel of three arbitrators, all of whom are to be senior executives within Cushman, which would settle the dispute.

25.     Because of the great amount of discretion afforded Cushman and its senior personnel in determining the compensation for brokers on completed transactions, Cushman has a duty under New York law and under the Employment Contract to administer the contract fairly and equitably, especially with respect to disputes to be decided under the Dispute Resolution Procedures.

## B.     **Cushman's Policy Manual**

26.     At the time that Price joined Cushman, it provided him with a copy of a Cushman policy manual (the "Policy Manual"), which prohibits any Cushman employee from engaging in illegal discrimination of any kind, including, but not limited to, discrimination based on "religion."

6

27.     The Cushman Policy Manual also encourages, and indeed requires, that Cushman employees report any instances of religious discrimination to their superiors, and states that any such good faith complainant is to be protected from retaliation: "Retaliation of any kind against an employee making a good faith complaint of discrimination or sexual harassment will not be tolerated and will subject the retaliator to disciplinary consequences, even if the original complaint of discrimination or sexual harassment was found to be unsupported." (Pertinent provisions of the Policy Manual are annexed hereto as "Exhibit 2.")

28.     Moreover, the Policy Manual includes detailed procedures as to how Cushman would investigate any claim of discrimination, and states, in pertinent part: "In all cases, the matter will be investigated thoroughly and promptly through, or under the supervision of, the Human Resources Department and when appropriate, in conjunction with the Legal Department or outside counsel."

## C.     Price's Initial Employment by Cushman and his Employment Contract

29.     In January 2003, Price became a member of Cushman's Brokerage Group, which provided brokerage services with respect to commercial rental property in the New York metropolitan region.

30.     From January 2003 through June 2004, Price worked successfully with several different brokers at Cushman on a variety of commercial real estate transactions.

31.     In or about June 2004, Podell, Senior Director of Retail Services for Cushman, invited Price to work with her on an exclusive basis, which he accepted. Podell asked Price to work with her because of his extensive knowledge concerning the ownership and availability of commercial rental space in Manhattan, and his track record of success in real estate transactions involving commercial property.

7

32.     Thereafter, and until April 26, 2006, Price worked with Podell as a commercial real estate broker and she acted as Price's supervisor at Cushman.

33.     At the inception of their work relationship, Price entered into an agreement with Podell (the "Commission Agreement"), by which Podell agreed to split her brokerage commission compensation with Price in an 80% to 20% ratio for transactions on which they both worked and which Podell had originated. Price would also receive 50% of commission income on transactions which he had originated. However, after they began working together, Podell instructed Price to work exclusively on transactions which she had originated.

34.     Price also received a monthly draw from Cushman against future commission income, equal to $65,000 annually.

35.     As a matter of general practice, when Price and Podell worked on a transaction together, Podell would make the initial contact with the Cushman client wanting to rent commercial space. Thereafter, Price would do most of the actual work on the transaction, including locating new potential office space for the client, negotiating rental terms with the owner, showing the space to the client (though Podell would usually participate in this client contact as well) and completing all necessary paperwork.

36.     From June 2004 until October 2005, Price enjoyed a productive working relationship with Podell. They worked on numerous transactions together, consistently abiding by the Commission Agreement, whereby Price was paid 20% of the gross commissions which they had jointly earned (including, for example, a transaction at 201 West 17th Street which closed in June 2005, with Podell getting an 80% split of $166,670 and Price getting a 20% split of $41,668).

8

37.    During this productive period, Price worked on the tenth floor of Cushman's offices with the other members of Cushman's Brokerage Group. The brokers were fully assisted by support staff, had camaraderie and shared information and strategies with one another.

**D.    The Illness and Death of Price's Son**

38.    Noah Price ("Noah"), one of Price's twin children, was born on May 9, 2002 with an atypical taratoid/rhabdoid tumor, a rare and highly malignant brain tumor.

39.    Podell was fully aware of Noah's illness before Price began working for her.

40.    In 2005, during Price's first full year working with Podell, Noah endured more than thirty surgical procedures. Despite Noah's cancer and intensive treatment (and its impact on Price's family), Price continued to work diligently and on a full-time basis with Podell at Cushman.

41.    Despite his son's illness, upon information and belief, Price was generally the first of the brokers employed by Cushman to arrive at the office in the morning; generally he did so at 8:00 a.m. or earlier.

42.    Upon information and belief, most of these brokers did not begin to arrive at the office until approximately 8:30 a.m., and Podell herself usually arrived at the office after 9:00 a.m.

43.    During this time, Price's productivity at the office did not suffer, and his work relationship with Podell produced significant results.

44.    Upon information and belief, Podell, who had earned approximately $160,000 in commissions in 2004, earned nearly $1,000,000 in commissions in 2005, by which time she and Price had worked together consistently for eighteen months.

45.    During Noah's illness, Price did not miss work, other than for religious holidays.

9

46.     On October 1, 2005, Noah died.

**E.     Price's Increased Religious Observance**

47.     During Noah's illness in 2005, Price became increasingly more religiously observant and connected to his Jewish faith. He and the rest of his family joined a synagogue associated with Chabad, the branch of Judaism that Price had embraced.

48.     Attending this synagogue, which was extremely supportive of Price's family during this difficult time, became an important aspect of Price's life, both spiritually and emotionally. Moreover, his synagogue supported his family financially, including by providing them with funds for mortgage payments, car payments and babysitting (to watch the Prices' two other children while the Prices were in the hospital with Noah).

49.     Price was, to his knowledge, the only employee in Cushman's Brokerage Group who was openly observant of his Jewish faith.

50.     After Noah's death, Price began attending synagogue early each morning to recite *Kaddish*, or mourning prayers, with his congregation. Every morning he put on *tefillin* (small leather boxes with straps that can be tied on the arm and around the head, holding parchment from sections of the Torah). According to Price's deepened religious beliefs, a mourner should wear *tefillin* during prayer services for nine months after a loved one's passing. *Tefillin* may be worn only during prayer services held during morning hours, and may not be worn at night. Therefore, it was necessary for Price to attend synagogue in the morning, in order to fulfill his religious obligations.

51.     After attending synagogue in the morning, Price usually arrived to work by 9:00 a.m., approximately one hour later than he had prior to his son's death.

52.     At this time, Price also began to pray during breaks at Cushman's offices.  He frequently asked permission to use unoccupied office space or a conference room, so that he could pray with the minimum amount of intrusion to his colleagues.  When a this sort of space was not available, he prayed near the window at his cubicle in Cushman's tenth floor offices.

53.     Price prayed openly and aloud (but barely audibly) two to four times a day, for about a five minute period of time, wearing a *yarmulke,* facing eastward and gently swaying.  He prayed by himself, as he was not aware of any other observant employees in the Brokerage Group with whom he could pray.

54.     On Price's desk in his cubicle at Cushman, he maintained numerous prayer books. He used these books while reciting his daily prayers.

55.     Upon information and belief, Podell is Jewish, but is not observant.

**F.     Podell Discriminates against Price Because of his Religious Practices**

56.     After Noah's death, Price continued to balance his religious practices so as not to interfere with his responsibilities at the office.  Nevertheless, Podell was openly displeased with and critical of Price's religious observance, and began to discriminate against him, based on his religious beliefs and observance.

57.     For example, Podell made it a point to interrupt Price during the few minutes a day that he would discreetly pray aloud.  She demanded that he move a prayer book out of sight. She vehemently complained that Price was not shaving, even though he explained to her that he was forbidden by his religious beliefs from shaving for one month following his son's death.

58.     During these encounters, Podell's voice became louder and nastier in tone than the time prior to Price's more religiously observant conduct.

59.     Another example occurred on October 5, 2005, the second day of Rosh Hashanah,

11

a Jewish holy day. Price had informed Podell that she should not e-mail him on Rosh Hashanah, and he explained exactly why, namely because this day was very sacred and holy to a practicing Jew and that he should not work on that day. In 2005, Rosh Hashanah was especially sacred to Price because he was still in mourning for his son, who had died just four days earlier.

60.     Nevertheless, Podell ignored Price's request, and on October 5, 2005 e-mailed Price with demands that Price resume work on Rosh Hashanah, with statements such as: "Do we have a completed agreement? Can we market the space?", "Let's add this to the list of tenants to contact: Marc Jacobs, Todd, and Roberto Cavali.", "Will you take care of this?", and "Let's get paid on Southworks."

61.     The next day, when Price complained to Podell about her sending e-mails to him on a religious holiday and so soon after his son had died, Podell was hostile and angry, and then dismissed Price from her office, because: "nobody can tell me what to do."

62.     Approximately two to three weeks after his son's death, Price arrived one morning at work at about 9:15 a.m. after reciting *Kaddish* at his synagogue. (He previously had informed Podell that he was praying at his synagogue in the mornings before work.)

63.     Before Price arrived, Podell apparently was searching for a document related to a particular real estate transaction on which they were working together.

64.     When Price arrived at the office, Podell was visibly angry. She confronted him, demanding to know why he had not arrived earlier.

65.     Price told Podell that he had been at his synagogue, praying because of his son's recent death.

66.     Podell informed Price that his morning prayers were "a problem" and instructed him that he had to pray at night.

12

67.    Price explained to Podell that he could not pray at night because of his religious beliefs, in that he could not wear the *tefillin* which formed a part of his mourning during the evening. Podell responded, "I don't care."

68.    Podell told Price that he had to find somewhere else to pray. She said, "We can't have this anymore, if you want to work for me. You're not going to be working here otherwise." As she said this to Price, Podell made a chopping motion with her one hand onto the other, leading Price to believe that he was in danger of being "cut" from her team and losing his job with Cushman if he continued to practice his religious beliefs. Price was terrified that Podell would terminate him because of his religious observance, at the most difficult time for his family, immediately after the death of his son.

## G.    **Price Complains of Discrimination**

69.    On the day that Podell threatened Price with termination, Price complained about this incident to Tani Brown ("Brown"), Director of Retail Services at Cushman. Brown is a direct subordinate of Suzy Reingold ("Reingold"), Cushman's Executive Managing Director for the New York Metro Region.

70.    In particular, Price told Brown that he was afraid of being fired because of his religious practices, and was also afraid that Podell would retaliate against him for complaining about her threats. When Price relayed the incident to Brown, he was visibly upset, and even began to cry. Brown's only response was to say: "Don't worry about her [Podell]."

71.    Shortly thereafter, Price also complained about Podell's threat to fire him to Grace Ben-Ezra ("Ben-Ezra"), Assistant Director of Employee Relations for Cushman. Ben-Ezra stated that she would "look into it."

13

72.     Upon information and belief, neither Ben-Ezra nor Brown investigated Price's complaints nor took any other action whatsoever in response to his complaints, in direct violation at the procedures in Cushman's own Policy Manual.

**H.     Cushman's Inaction Forces Price to Change his Synagogue**

73.     Following Podell's threats and Price's complaints to Brown and Ben-Ezra, and Cushman's subsequent inaction, Price concluded that he had no other option but to stop attending his synagogue for morning *Kaddish* prayers. He found a different synagogue that offered the prayers at an even earlier time. Although this new synagogue was not affiliated with the branch of Judaism with which Price identified, Chabad, he felt he had no choice, given Podell's threat to terminate him, because he needed his job, as well as his health insurance for himself and his family.

74.     Price began waking up at 5:00 a.m. in order to drive to the new synagogue to recite *Kaddish* and still arrive at work by 8:00 a.m.

75.     Because Price no longer attended morning prayers at his former synagogue, that community, which was financially supporting Price's family, shortly thereafter withdrew that support.

76.     Despite Price's actions, Podell still was not satisfied, and continued to discriminate against him in additional ways.

**I.     Podell's Continuing Discriminatory Acts**

77.     Podell, following Price's complaints to Cushman's supervisors, continued to discriminate against him. For example, in November 2005, approximately one month after his son's death, Price asked Podell if he could hang a *mezuzah* (a piece of parchment in a case inscribed with verses from the Torah) at his cubicle workstation, in order to bless his work area

14

and give him comfort in coping with the loss of his son, by expressing his deep connection to his Jewish beliefs. The *mezuzah,* in a three-inch narrow wooden case, would have been placed on the side of his cubicle wall, attached by a magnet or piece of clear tape, and would not have been visible to passersby.

78.     Brokers at Cushman have numerous different personal items hanging on their cubicle walls and in their cubicles, including family and other candid pictures, Yankee hats, toys, and other promotional items. Brokers also store a number of items on the top of their cubicle walls, including files and inboxes. All of these items are in open view and visible to passersby.

79.     Podell summarily rejected Price's request to hang a *mezuzah*, as did Veronica Shafer ("Shafer") who coordinated office moves at Cushman at the time. In response to his request, Shafer told Price, "It is not your office, it is [Cushman's] office."

**J.     Cushman and Podell Refuse to Pay Commissions Due Price and Price Was Forced to Stop Working with Podell**

80.     In order to allocate individual commission payments among Cushman employees for a given transaction, the commission and the breakdown of payments among the employees must be recorded in Cushman's books and records using what is commonly called in the industry a "revenue transmittal document." When Price first started working with Podell, it was he who would record the transactions on which the two of them worked.

81.     However, during the first three months of 2006, Podell refused to allow Price to book three deals which had closed and for which Price was owed a 20% share of the commissions under the Compensation Agreement (for Anne Klein at 655 Madison Avenue, Ann Taylor in Times Square and Kate's Paperie on Spring Street) (the "Three Transactions"). By this

15

step, Podell deliberately prevented Price from receiving his earned commissions in connection with his work on those deals.

82.     In late March or early April 2006, Podell proposed a new commission split agreement with Price by which he would be paid for calendar year 2006, retroactive to the beginning of the year, which would include his work on the Three Transactions and for additional deals on which the two had worked during the earlier part of 2006.

83.     Podell's proposal was inconsistent with the Commission Agreement, pursuant to which Price was entitled to receive a commission split of 20%. Under the Commission Agreement, Price would have received approximately $234,000 for the Three Transactions, while under Podell's new proposal, Price would have received only a fraction of that amount for transactions to which he had already contributed.

84.     Because Podell's commission proposal violated the Commission Agreement, and would have deprived Price of compensation that was due to him, he rejected her proposal.

85.     Upon information and belief, Podell's attempt to unilaterally change the terms of Price's Commission Agreement was actuated by her distaste for and disapproval of Price's more observant practice of Judaism.

86.     As a result of Podell's continued religious discrimination against Price, Cushman's failure to intervene and to respond to Price's complaints, and because of Podell's failure to support Price's request from Cushman for the fair payment of commissions due to him under the Commission Agreement, Price was no longer able to work with Podell.

87.     Accordingly, on April 26, 2006, Price announced to Susan Reingold ("Reingold"), Executive Managing Director of the New York Area, that Price and Podell were ending their working relationship, effective as of that date.

88.     Shortly thereafter, Cushman ceased paying Price his draw.

89.     Moreover, at about this time, using revenue transmittal documents, Podell herself booked two of the Three Transactions—transactions which, as set forth in paragraph 81 herein, she had previously prevented Price from booking.

90.     When Podell booked these two transactions in Cushman's database, she categorized the transactions as being 100% attributable to her, even though Podell and Price had worked on the transactions together and Price accordingly was entitled to 20% of the commissions pursuant to the Commission Agreement.

## K.  **Cushman Violates the Employment Contract by Refusing to Permit Price to Use the Dispute Resolution and Arbitration Provisions Thereof**

91.     In or about April 2006, Price demanded, pursuant to the Dispute Resolution Procedures of the Employment Contract, that the allocation of commissions as between Price and Podell be determined by voluntary dispute resolution and, if necessary, by arbitration, under the Dispute Resolution Procedures of the Employment Contract.

92.     Cushman, however, refused and failed to permit Price to make use of the Dispute Resolution Procedures. Instead, in violation of such provisions, Reingold informed Price that she intended to make a "final" and "binding" decision regarding the amount of commissions to be paid to him, and that under no circumstances would he be permitted to arbitrate the dispute.

93.     Price protested this violation of the Dispute Resolution Procedures, but Cushman refused to permit him the full use of such procedures, thereby violating the Employment Contract with Price.

94.     Upon information and belief, Reingold is a personal friend of Podell's, and has conducted a substantial amount of business with Podell, rendering her a wholly unsuitable person

17

to be making a determination as to the compensation due Price from transactions involving Podell, under the Employment Contract.

95.     After Reingold's announcement that she intended to unilaterally decide the amount of earned commissions he was owed, Price met with her under protest to discuss his commission situation.

96.     During that meeting, Price also complained to her about Podell's religious discrimination, informing her, among other things, that Podell had forced him to change the synagogue at which he prayed in the morning.

97.     Upon information and belief, Reingold took no action to remedy Cushman's discriminatory practices.

98.     At or about this time, Price also met with Edward Weiss ("Weiss"), Cushman's Chairman of the Board.  In that meeting, Price complained regarding the religious discrimination he experienced, including Podell's attempt to inhibit him from praying and putting on *tefillin* in the mornings by demanding that he pray at night.  However, even after this meeting, neither Cushman nor Weiss took any action to address the discrimination suffered by Price.

## L.     Reingold's Retaliatory and Extracontractual Determination

99.     On or about June 16, 2006, nearly two months after she announced her intention to decide Price's commission dispute with Podell, Reingold issued her determination.  Reingold decided that Price should be paid commissions on the Three Transactions at drastically reduced rates, ranging between 1% and 5% per transaction, far less than even Podell herself had suggested in her proposals, and only a fraction of the amount that should have been paid to Price under the Commission Agreement.  Thus, rather than the approximately $234,000 which was

18

due to Price under the Commission Agreement for the Three Transactions, Reingold recommended a payment of only some $23,000.

100.    Reingold also made determinations for several additional transactions to which Price had contributed, that appeared likely to close and generate commission income, which transactions were subject to the Commission Agreement between Price and Podell. For these transactions as well, Reingold determined that Price should be paid a minimal amount (between 1% and 5%), rather than the 20% to which he was entitled.

101.    For example, for a lease for an Ann Taylor store on 600 Third Avenue, Reingold determined that Price should receive only a $52,000 commission, rather than the $260,000 to which he would be entitled upon the closing of the deal under the Commission Agreement.

102.    Price advised Reingold and others at Cushman that he did not accept Reingold's determination, and requested that the disputes over the Three Transactions (and all other transactions on which Price had worked, many of which were about to close) be arbitrated using the Dispute Resolution Procedures. However, his request for arbitration was denied.

103.    Cushman, did not pay Price even the grossly inadequate amount of commissions "awarded" to him for the Three Transactions pursuant to Reingold's determination until the end of September 2006. Accordingly, Price received no compensation whatsoever from Cushman for almost five months (not commissions or even his draw), and only a small part of what was due him thereafter.

104.    Price complained about this determination to Dennis Waggner ("Waggner"), Managing Director of New York Area Operations, and about Podell's discrimination against him. However, upon information and belief, Waggner took no action to assist Price.

**M.**    **Cushman's Institutional Retaliation**

105.    Following Reingold's extracontractual and improper determination of commissions due to Price, Cushman began an institution-wide campaign against Price.

106.    Upon information and belief, Cushman did so in order to retaliate against Price for his complaints of religious discrimination.

107.    On or about June 29, 2006, Cushman transferred Price from the tenth floor, where all the other Brokerage Group brokers sat, to the eighth floor, where Cushman's non-broker research analysts sit. Because Price's assistant remained on the tenth floor, in effect, he lost the use of her services, and had to perform most if not all of his administrative tasks himself.

108.    Reingold later informed Price that he was transferred in order to give him a "change of scenery."

109.    After Price learned of the transfer, he asked Waggner if Cushman would assign him to an office on the eighth floor, so that he would not have to continue borrowing a room in order to say his daily prayers, or saying prayers at a window or in the middle of the hallway. Waggner, however, refused this accommodation, and Price instead was assigned to the front desk of a two-person cubicle, where he had to sit almost in the doorway to the hall. As the back desk in this cubicle (at the window) was unassigned, Price asked Waggner if he could switch desks. Waggner, however, refused this request as well. (During the remainder of Price's employment, no employee was ever assigned to the back desk at the window.)

**N.**    **Price's Employment Is Terminated after He Complains again about Discrimination**

110.    By September 21, 2006, Price had not been paid any compensation whatsoever by Cushman for nearly five months. His family, which was (and is) dependent on his compensation, was in a desperate financial situation, made worse by the fact that they were no

longer receiving support from Price's former synagogue, due to Podell's demand that he change synagogues in order to pray at an earlier hour in the morning.

111.    On or about September 21, 2006, Price met with Joe Harbert ("Harbert"), Chief Operating Officer for the New York Metro Region.

112.    During that meeting, Price complained that he had received no compensation from Cushman for nearly five months, and also complained to Harbert about the religious discrimination and retaliation he had experienced (and was experiencing) from Podell and Reingold. In particular, Price told Harbert that Podell had criticized his praying in the mornings, and had forced him to change synagogues due to her threat to terminate his employment. Price explained to Harbert that he could not pray at night, as Podell demanded, because *tefillin* can only be worn during morning prayers. Moreover, he complained about his transfer to the eighth floor, away from his department, and about the fact that Cushman had refused to allow him to arbitrate commission disputes.

113.    During that meeting, Harbert told Price that he was "well-liked" and that there were "no plans to terminate [him]." Harbert also told Price that he could not do anything about the actions of Reingold or Podell, but he would try to get Price paid something. (Shortly thereafter, Cushman did pay Price the approximately $23,000 which Reingold had "awarded" him for his work on the Three Transactions.) Harbert suggested that Price approach Tony Marano ("Marano"), Cushman's Chief Executive Officer of the Americas, and speak with him directly.

114.    Following his complaints of discrimination and retaliation to Harbert on September 21, 2006, no investigation or correction ensued, and Price's employment situation deteriorated even further.

115. Upon information and belief, Brown reprimanded at least one other broker, Robert Mitchell, who tried to work with Price on transactions, discouraging that broker from working with Price and thereby diminishing Price's capacity to earn commissions.

116. On or about October 12, 2006, Price met with Marano. In their meeting, Price once again complained about the religious discrimination and retaliation he was experiencing, including Reingold's determination regarding his commissions. In particular, Price told Marano that Podell threatened to fire him if he did not change synagogues.

117. On October 23, 2006, only ten days after Price complained to Marano about discrimination and retaliation, his employment with Cushman was terminated. This happened without any warning or explanation, effective November 6, 2006, in a meeting with Waggner, and representatives from Cushman's Human Resources and/or Legal Departments.

118. In that meeting, Price asked Waggner for the reasons for his termination. Waggner told him, "You are an at-will employee." Waggner proceeded to escort Price to his cubicle to retrieve his personal items, then escorted him out of Cushman's offices.

119. Shortly after his termination, Price called Waggner to find out if he would be paid for additional transactions on which he had worked. In that conversation, Waggner told Price that he was not fired "for cause," but once again, he failed to provide Price with an explanation as to why his employment was terminated.

## O. Price's Health And Family Suffer Because Of The Discriminatory and Retaliatory Treatment

120. The effects of the religious discrimination and the retaliation have caused Price great financial, professional, emotional and physical harm.

22

121.   During Noah's illness and after his death, Price came to work daily and maintained the high quality of work he had been providing during his entire career at Cushman.

122.   Yet, the discrimination Price experienced at the hands of Podell and Cushman caused him tremendous stress. In order to deal with this stress, he began psychological therapy on a weekly basis.

123.   In addition, during this stressful period, Price developed adult-onset diabetes and an exacerbated case of sleep apnea.

124.   After his termination, Price was unemployed for a long period of time, and he has been unable to rebuild his earning potential. Upon information and belief, Price believes that his reputation was damaged as well.

P.   **Additional Commissions Due to Price for Deals Closing After His Termination**

125.   Prior to Price's termination, he had worked on a number of additional transactions pursuant to the Commission Agreement with Podell, other than the Three Transactions, for which he was entitled to receive a 20% split of commissions with Podell. These transactions included an Ann Taylor store at 600 Fifth Avenue, an Ethan Allen store at 1010 Third Avenue and a store a 48 Main Street and a store at 53 Job's Lane (the "Additional Transactions").

126.   Price had contributed substantial efforts to the successful location and negotiation of terms for each of these Additional Transactions.

127.   Prior to his termination, Price had requested that he be paid commissions for each of these Additional Transactions under the Commission Agreement, and that any disputes over payment be arbitrated under the Dispute Resolution Procedure contained in his Employment Contract.

128.    Prior to his termination, Cushman advised Price that he would be denied any opportunity to use the Dispute Resolution Procedures with respect to these Additional Transactions.

129.    Upon information and belief, each of these Additional Transactions closed while Price was still employed at Cushman, or within a three month period thereafter, so that Cushman is required to pay Price commissions for each of the transactions, pursuant to Paragraph 13(b) of the Employment Contract.

130.    Upon information and belief, as calculated under his Commission Agreement with Podell, Price was entitled to commissions from these Additional Transactions in the amount of at least $500,000. Of this amount, Cushman paid him only $50,000, following his termination.

131.    Neither Cushman nor Podell has paid him any of the balance due to him in connection with the Additional Transactions.

**Q.    Price Complains to the EEOC**

132.    Within the time provided by law, Price submitted his claims of employment discrimination under 42 U.S.C. § 2000e *et seq.* to the Equal Employment Opportunity Commission ("EEOC") and received a "right to sue" letter therefrom.

**FIRST CLAIM BY PLAINTIFF PRICE AGAINST DEFENDANT CUSHMAN**
**(Unlawful Employment Discrimination in Violation of 42 U.S.C. § 2000e *et seq.*)**

133.    Price repeats and realleges each and every allegation contained in paragraphs 1 through 132 of this complaint.

134.    Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, prohibits, among other things, discharging, harassing, retaliating or discriminating against an employee based on his or her religion.

24

135.     In or about October 2005, Cushman initiated a continuing campaign of religious discrimination against Price because of his religious beliefs and practices, which continued through his wrongful termination in October 2006.

136.     During this period of time, Cushman failed to reasonably accommodate Price's religious beliefs and practices, by, for example, demanding that he cease attending the synagogue of his choice; refusing to allow him to display the nondisruptive signs of his faith and refusing to accommodate his reasonable request for a workspace in which he could comfortably pray from time to time without disrupting the work of his fellow employees.

137.     Moreover, during this period of time, Podell, Reingold and others employed by Cushman created an intimidating, hostile and offensive work environment for Price.

138.     Finally, through this period of time, both as part of the aforesaid campaign of religious discrimination, and as retaliation against Price for his reporting of religious discrimination, Cushman deprived Price of commissions that were due to him; created numerous barriers to Price's acting as broker on additional real estate transactions; failed to investigate his complaints of religious discrimination; gave sanction to Podell's wrongful conduct toward Price; and ultimately terminated Price on October 23, 2006.

139.     These actions, taken singly and in their entirety, constituted unlawful discrimination in violation of 42 U.S.C. § 2000e *et seq*.

140.     As a direct, proximate and foreseeable cause of Cushman's violations of 42 U.S.C. § 2000e *et seq*., Price has suffered humiliation, embarrassment, mental and emotional discomfort and loss of wages.

141.     As a further proximate result of Cushman's unlawful employment practices, Price has had to incur attorney fees, costs and incidental damages.

142.    As a result of the wrongful actions of defendant Cushman, plaintiff Price is entitled to recover actual damages in an amount to be proven at trial, but in no event less than $5,000,000, and punitive damages in the amount of no less than $5,000,000.

**SECOND CLAIM BY PLAINTIFF PRICE
AGAINST DEFENDANTS CUSHMAN AND PODELL**
**(Unlawful Employment Discrimination in Violation of the
New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq.*
and the New York City Civil Rights Law,
Administrative Code of the City of New York § 8-101 et seq.)**

143.    Plaintiff Price repeats and realleges each and every allegation contained in paragraphs 1 through 142 of this complaint.

144.    The New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq.,* and the New York City Civil Rights Law, Administrative Code of the City of New York § 8-101 *et seq.*, prohibit, among other things, discharging, harassing, retaliating or discriminating against an employee based on his or her religion.

145.    In or about October 2005, defendants initiated a continuing campaign of religious discrimination against Price because of his religious beliefs and practices, which continued through his wrongful termination in October 2006.

146.    During this period of time, defendants failed to reasonably accommodate Price's religious beliefs and practices, by, for example, demanding that he cease attending the synagogue of his choice; refusing to allow him to display the nondisruptive signs of his faith and refusing to accommodate his reasonable request for a workspace in which he could comfortably pray from time to time without disrupting the work of his fellow employees.

147.    Moreover, during this period of time, defendants created an intimidating, hostile and offensive work environment for Price.

148.    Finally, through this period of time, both as part of the aforesaid campaign of religious discrimination, and as retaliation against Price for his reporting of religious discrimination, defendants deprived Price of commissions that were due to him; created numerous barriers to Price's acting as broker on additional real estate transactions; failed to investigate his complaints of religious discrimination; gave sanction to Podell's wrongful conduct toward Price; and ultimately caused Price's termination on October 23, 2006.

149.    These actions, taken singly and in their entirety, constituted unlawful discrimination in violation of The New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq.* and the New York City Civil Rights Law, Administrative Code of the City of New York § 8-101 *et seq.*

150.    As a direct, proximate and foreseeable cause of defendants' violations of these statutes, Price has suffered humiliation, embarrassment, mental and emotional discomfort and loss of wages.

151.    As a further proximate result of defendants' unlawful employment practices, Price has had to incur attorney fees, costs and incidental damages.

152.    As a result of the wrongful actions of defendants, plaintiff Price has sustained damages in an amount to be proven at trial, but in no event less than $5,000,000.

## THIRD CLAIM BY PLAINTIFF PRICE AGAINST DEFENDANT CUSHMAN
### (Breach of Contract)

153.    Price repeats and realleges the allegations contained in paragraphs 1 through 152 as if fully set forth herein

154.    Cushman, by its statements in its Policy Manual, entered into an enforceable agreement with employees like Price that it would not retaliate against them for reporting discriminatory conduct within Cushman.

155. Nevertheless, by its retaliatory conduct, including but not limited to Price's termination, Cushman violated its contractual obligations to Price.

156. As a result of Cushman's breaches, Price has been damaged in an amount to be determined at trial, but in no event less than $5,000,000, and in addition to such damages, Price is entitled to recover interest thereon, costs and disbursements and attorneys' fees.

## FOURTH CLAIM BY PLAINTIFF PRICE AGAINST DEFENDANT CUSHMAN
### (Breach of Contract)

157. Price repeats and realleges the allegations contained in paragraphs 1 through 156 as if fully set forth herein

158. Cushman, by its actions and inactions as set forth herein breached the Employment Contract, including the Dispute Resolution Procedures thereof.

159. As a result of Cushman's breaches, Price has been damaged in an amount to be determined at trial, but in no event less than $650,000, and in addition to such damages, Price is entitled to recover interest thereon, costs and disbursements and attorneys' fees..

## FIFTH CLAIM BY PLAINTIFF PRICE AGAINST DEFENDANT CUSHMAN
### (Violation of the Duty of Good Faith and Fair Dealing)

160. Price repeats and realleges the allegations contained in paragraphs 1 through 159 as if fully set forth herein

161. Under New York law, each party to a contract has a duty of good faith and fair dealing toward the other party to the contract.

162. Cushman, by its actions and inactions as set forth herein, including its failure to permit Price to make effective use of the Dispute Resolution Procedures of the Employment Contract, violated its duty of good faith and fair dealing towards Price.

163.    As a result of Cushman's breaches of the duty of good faith and fair dealing, Price

has been damaged in an amount to be determined at trial, but in no event less than $650,000, and

in addition to such damages, Price is entitled to recover interest thereon, costs and disbursements

and attorneys' fees.

### SIXTH CLAIM BY PRICE AGAINST DEFENDANT CUSHMAN
### (N.Y. Labor Law § 190 *et seq.* )

164.    Price repeats and realleges the allegations contained in paragraphs 1 through 163

as if fully set forth herein

165.    The actions of Cushman, including the failure to pay Price earned commissions

during his employment and continuing thereafter as set forth herein violates New York Labor

Law § 190 *et seq.*

166.    As a result of Cushman's violations of New York Labor Law, Price has been

damaged in an amount to be determined at trial, but in no event less than $650,000, and in

addition to such damages, Price is entitled to recover interest thereon, liquidated damages, costs

and disbursements and attorneys' fees..

### SEVENTH CLAIM BY PLAINTIFF PRICE AGAINST DEFENDANT CUSHMAN
### (N.Y. Labor Law § 190 *et seq.* )

167.    Price repeats and realleges the allegations contained in paragraphs 1 through 166

as if fully set forth herein.

168.    Price terminated Price's employment as alleged herein and failed and refused to

pay Price the commissions due to him within the time period prescribed by law.

169.    Cushman's failure and refusal to pay the above said sums violates New York

Labor Law § 190 *et seq.*

170.    As a result of Cushman's violations of New York Labor Law, Price has been damaged in an amount to be determined at trial, but in no event less than $650,000, and in addition to such damages, Price is entitled to recover interest thereon, liquidated damages, costs and disbursements and attorneys' fees.

## EIGHTH CLAIM BY PLAINTIFF PRICE AGAINST DEFENDANTS
### (Unjust Enrichment)

171.    Price repeats and realleges the allegations contained in paragraphs 1 through 170 as if fully set forth herein.

172.    Cushman specifically requested and Price provided, with Cushman's knowledge, the services described herein for the benefit of Cushman at Price's own expense with the understanding that Price would be paid for the services.

173.    Cushman accepted and received Price's services, and continues to retain the benefits thereof, improperly and without justification.

174.    After Price performed such services, Cushman refused to pay the full amount due and owing for the services.

175.    Cushman accepted and received the benefits of the services performed by Price but improperly refused, without justification, to compensate Price for such services.

176.    On the basis of the foregoing, Cushman has been unjustly enriched at the expense of Price.

177.    In equity and good conscience, Cushman should make restitution to Price of the full amount by which Cushman has been unjustly enriched.

178.    As a result of Cushman's conduct, Price has been damaged in an amount to be determined at trial, but in no event less than $650,000, and in addition to such damages, Price is entitled to recover interest thereon, costs and disbursements and attorneys' fees.

## NINTH CLAIM BY PLAINTIFF PRICE AGAINST DEFENDANT CUSHMAN
### (Quantum Meruit)

179.   Price repeats and realleges the allegations contained in paragraphs 1 through 178 as if fully set forth herein.

180.   Cushman specifically requested, and Price provided in good faith, the services described herein for the benefit of Cushman, and Cushman agreed to compensate Price as stated herein.

181.   At the time Price was performing the services, Cushman knew that Price was performing the services, was aware that Cushman expected to be paid for the services, and accepted the value of the services.

182.   Cushman has failed and refused without justification or cause to compensate Cushman for the reasonable value of the services rendered and for the benefit it received therefrom.

183.   Price is entitled to the reasonable value of the services he rendered.

184.   On the basis of the foregoing, Cushman is responsible to compensate Price in *quantum meruit* for the value of the services he rendered.

185.   As a result of Cushman's conduct, Price has been damaged in an amount to be determined at trial, but in no event less than $650,000, and in addition to such damages, Price is entitled to recover interest thereon, costs and disbursements and attorneys' fees.

## TENTH CLAIM BY PLAINTIFF PRICE AGAINST DEFENDANT PODELL
### (Breach of Contract)

186.   Price repeats and realleges the allegations contained in paragraphs 1 through 185 as if fully set forth herein

31

187.    Podell, by her actions and inactions as set forth herein breached the Compensation

Agreement.

188.    As a result of Podell's breaches, Price has been damaged in an amount to be

determined at trial, but in no event less than $650,000, and in addition to such damages, Price is

entitled to recover interest thereon, costs and disbursements and attorneys' fees.

## ELEVENTH CLAIM BY PLAINTIFF PRICE AGAINST DEFENDANT CUSHMAN
### (Violation of the Duty of Good Faith and Fair Dealing)

189.    Price repeats and realleges the allegations contained in paragraphs 1 through 188

as if fully set forth herein

190.    Under New York law, each party to a contract has a duty of good faith and fair

dealing toward the other party to the contract.

191.    Podell, by her actions and inactions as set forth herein, violated her duty of good

faith and fair dealing towards Price.

192.    As a result of Podell's breaches of the duty of good faith and fair dealing, Price

has been damaged in an amount to be determined at trial, but in no event less than $650,000, and

in addition to such damages, Price is entitled to recover interest thereon, costs and disbursements

and attorneys' fees.

## TWELFTH CLAIM BY PLAINTIFF PRICE AGAINST DEFENDANT PODELL
### (Unjust Enrichment)

193.    Price repeats and realleges the allegations contained in paragraphs 1 through 192

as if fully set forth herein.

194.    Podell specifically requested and Price provided, with Podell's knowledge, the

services described herein for the benefit of the Podell at Price's own expense with the

understanding that Price would be paid for the services.

195.     Podell accepted and received Price's services, and continues to retain the benefits
thereof, improperly and without justification.

196.     After Price performed such services, Podell refused to pay the full amount due
and owing for the services.

197.     Podell accepted and received the benefits of the services performed by Price but
improperly refused, without justification, to compensate Price for such services.

198.     On the basis of the foregoing, Podell has been unjustly enriched at the expense of
Price.

199.     In equity and good conscience, Podell should make restitution to Price of the full
amount by which Cushman has been unjustly enriched.

200.     As a result of Podell's conduct, Price has been damaged in an amount to be
determined at trial, but in no event less than $650,000, and in addition to such damages, Price is
entitled to recover interest thereon, costs and disbursements and attorneys' fees.

## THIRTEENTH CAUSE OF ACTION BY
### PLAINTIFF PRICE AGAINST DEFENDANT PODELL
### (Tortious Interference with Contract and Prospective Contractual Relations)

201.     Plaintiff Price repeats and realleges each and every allegation contained in
paragraphs 1 through 200 of this complaint.

202.     Upon information and belief, defendant Podell was fully knowledgeable that: (1)
Price and Cushman had entered into the Employment Contract, pursuant to which Cushman was
paying commissions to Price as compensation for his work; and (2) Cushman and Price had an
established business relationship pursuant to which Cushman was compensating Price for
providing brokerage services to Cushman.

33

203. Upon information and belief, defendant Podell directly and indirectly, unfairly and maliciously interfered with Price's existing contract and/or prospective business relationships with Cushman, by, among other things: (a) inducing other employees at Cushman to treat Price unfairly and fail to compensate him for the work he was performing at Cushman; and (b) inducing Cushman to terminate Price's employment.

204. Podell had no legitimate justification for her actions, acted outside the scope of her authority as an employee of Cushman, acted solely to harm Price and used wrongful means to cause his termination.

205. Consequently, defendant Podell has destroyed the business relationship between Cushman and Price, causing Price substantial loss of revenue and profits, causing Price to lose his job with Cushman and causing Price to lose reputation and goodwill in the industry.

206. As a result of Podell's conduct, Price has been damaged in an amount to be determined at trial, but in no event less than $5,000,000, and in addition to such damages, Price is entitled to recover interest thereon, costs and disbursements, attorneys' fees and punitive damages in the amount of $5,000,000.

**WHEREFORE**, Plaintiff Price demands judgment against defendant Cushman and Podell, as set forth herein, and for such other further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff Price hereby demands a trial by jury of all issues so triable.

Dated: New York, New York
      October 16, 2008

REAVIS PARENT LEHRER LLP

By: _____

Mark H. Moore (MM 8604)
41 Madison Avenue
41st Floor
New York, New York 10010
(212) 763-4100

Attorneys for Plaintiff Mark B. Price

Exhibit 1

# BROKER-SALESPERSON EMPLOYMENT CONTRACT

AGREEMENT made as of this 8th day of January, 2003   between Cushman & Wakefield, Inc. hereinafter referred to as "C&W" and Mark Price residing at 85 Maria Drive, Hillsdale, NJ  07642 hereinafter referred to as "Employee".

C&W being willing to employ Employee and Employee being willing to be employed by C&W, on the terms, covenants and conditions set forth herein, C&W and Employee mutually agree as follows:

1.    C&W hereby employs Employee as real estate broker/salesperson and Employee accepts such employment.  C&W shall furnish Employee with office space, desk, telephone, stationery, business cards, secretarial service and such other support services as C&W deems appropriate to facilitate the transaction of C&W's real estate business by Employee.  C&W shall furnish Employee with such advice, information and assistance as C&W deems necessary with respect to Employee's assigned activities. C&W shall provide Employee with the standard C&W fringe benefits generally extended to other C&W brokerage employees of like status and responsibility and in accordance with C&W's policy as may be determined from time to time during the term of this Agreement.

2.    Employee shall faithfully devote his full business time and best efforts to aid and assist C&W in the transaction of C&W's business. At all times, Employee shall conduct his activities and regulate his habits in a manner so as to maintain and promote the business and reputation of C&W.  C&W shall have the right to direct Employee with respect to the methods, techniques and procedures utilized by Employee in the performance of his services in order to assure that the good will and reputation of C&W are not diminished or impaired. Employee shall not collect or receive any monies or other consideration for any real estate related business undertaken or services rendered other than in the name of, on behalf of, and as an employee of C&W.  During the term of this Agreement, Employee shall not, without the prior written consent of C&W, buy, sell, lease, invest, take an option or otherwise directly or indirectly participate or deal in real property for his own account, except with respect to his personal residence and/or vacation home, nor shall Employee act as a principal, whether disclosed or undisclosed, in connection with any transaction involving real property or in any other transaction which may involve C&W in an actual or potential conflict of interest.

3.    C&W shall pay Employee and Employee accepts as his full and only compensation for all his services rendered, the percentages of the commissions and fees collected by C&W on transactions in which Employee has rendered services, under the circumstances and as determined in accordance with the Schedule of Compensation annexed hereto and made part hereof.  C&W shall have the right to set-off or recoup from Employee's compensation any monies due C&W from Employee pursuant to this Agreement or pursuant to any arrangement between C&W and Employee for advances, loans or draws against commissions and fees.  C&W shall have the right to withhold from Employee's compensation, an amount deemed sufficient by C&W, if any claim be made or threatened by or against C&W with respect to any commission or fee collected, including the internal allocation of same, or if any commission or fee be subject to any contingency requiring the return of same. C&W shall have the right, at any time, in its sole discretion to amend or modify the terms and conditions of the Schedule of