UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MARK B. PRICE,

                              Plaintiff,

             -against-                                    08 Civ. 8900 (RJH)

                                                          **MEMORANDUM OPINION**
                                                          **AND ORDER**

CUSHMAN & WAKEFIELD, INC. and JOANNE
PODELL,

                              Defendants.

Richard J. Holwell, District Judge:

        Plaintiff commenced this action on October 16, 2008, against defendants Cushman &

Wakefield, Inc. ("Cushman") and Joanne Podell, alleging employment discrimination in

violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, the

New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 290 *et seq.*, and the New

York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-101 *et seq.*; breach of

contract; violations of the duty of good faith and fair dealing; failure to pay commissions in

violation of N.Y. Lab. Law § 190; unjust enrichment and quantum meruit; and tortious

interference with contractual relations.  Upon defendants' motion to dismiss, the Court dismissed

the claims against Cushman for violations of the covenant of good faith and fair dealing and for

unjust enrichment, as well as the claims against Podell for tortious interference.  *Price v.*

*Cushman & Wakefield, Inc.*, 2009 WL 3075599 (S.D.N.Y. Sept. 26, 2009).  Now before the

Court is defendants' motion for summary judgment on the remaining claims.  For the reasons

that follow, that motion is GRANTED in part and DENIED in part.

1

## BACKGROUND

### I. The Parties

Defendant Cushman is a commercial real estate services firm offering, among other things, tenant and landlord brokerage services.  (Defs.' Rule 56.1 Stmt. ¶ 1.)  Defendant Podell was a senior broker in Cushman's Retail Brokerage Group during the relevant time period, and has been employed by Cushman since August 2002, when Cushman recruited her from New Spectrum Newmark Real Estate ("Newmark").  (*Id.* ¶¶ 2, 4.)  By the spring of 2006, Podell had over fourteen years of experience as a commercial real estate broker.  (*Id.* ¶ 3.)

Price worked as a broker in Cushman's New York City office from January 2003 through his termination on October 23, 2006.  (*Id.* ¶¶ 7.)  Prior to becoming a broker, Price was a pharmacist for approximately twenty years and currently works as a pharmacist.  (*Id.* ¶ 8.)  In 2000, Price decided to become a broker, and began work at Eastern Consolidated ("Eastern"), which specialized in commercial properties.  (Price Decl. ¶ 3.)

### II. Price Begins Employment with Cushman

In December 2002, two of Price's senior colleagues at Eastern, John Epstein and Charles Kinsgley informed Price that Cushman was recruiting them and asked whether he wished to join them.  (Price Decl. ¶ 5; *see* Burke Affirmation ("Burke Affir.") Ex. S ("Kingsley Dep.") at 15-16.)  Epstein, Kingsley, and Price, along with Yoav Olsner, (collectively, the "Eastern Group") engaged Howard Adler, a partner at the time with Fried, Frank, Harris, Shriver & Jacobson LLP, to negotiate their contracts with Cushman.  (Defs.' Rule 56.1 Stmt. ¶ 52.)  During the negotiations, Adler met with the Eastern Group about their contracts' terms; at least three of these meetings were held.  (*Id.* ¶ 53.)  Price unsuccessfully negotiated for an expense account but did obtain a side letter to his contract permitting him to continue working on real estate

transactions with his former employer for twelve months. (*Id.* ¶ 55; Burke Affir. Ex. GG.) Price signed his contract, paragraph 10 of which is a jury waiver for actions "arising out of" the contract. (Burke Affir. Ex. R.) Price did not ask his counsel to negotiate this provision. (Defs.' Rule 56.1 Stmt. ¶ 58.)

The Eastern Group joined Cushman's Financial Services Brokerage Group in January 2003, where Price was a junior broker on the team. (*Id.* ¶ 9; Kingsley Dep. at 30.) In early 2004, Price was asked to leave the Eastern Group team. (Kingsley Dep. at 44-45; Burke Affir. Ex. E ("Price Dep.") at 958-61; Price Decl. ¶ 10.) Thereafter, Price worked independently at Cushman until Podell brought him onto her team in mid-2004. (Price Dep. at 966-67; Price Decl. ¶¶ 10, 11; Defs.' Rule 56.1 Stmt. ¶ 6.) According to Price, he and Podell negotiated an oral agreement at the start of their working relationship under which Price would receive a 20% commission on transactions they worked on that Podell originated, and a 50% commission on transactions that he originated. (Price Decl. ¶ 14.) According to Podell, the oral agreement only provided a "goal" for Price's compensation to be "at least the $200,000 he had been making." (Burke Affir. Ex. C ("Podell Dep.") at 219.)

### III. Death of Price's Son and Price's Growing Religiosity

Price's son, Noah, born May 9, 2002, was diagnosed with a malignant brain tumor and hospitalized for most of his life until his death on October 1, 2005. (Defs.' Rule 56.1 Stmt. ¶¶ 60, 61.) Podell and Cushman were aware of Noah's illness and death. (*Id.* ¶ 62.)

Although Price had attended temples from the Chabad branch of Judaism since 2000, in 2003 and 2004, he became much more committed to Chabad. (Price Decl. ¶ 31; *see also* Price Dep. at 316-17, 327.) Price became stricter in his religious practices, keeping kosher, learning Hebrew, and going to temple and praying more often. (*See* Price Decl. ¶ 31; Price Dep. at 311-

13, 332-33.)  The Chabad community from Price's synagogue also helped Price by giving him a special Torah scribed for Noah, by offering babysitting and cooking services, and by assisting Price's family financially.  (Price Dep. at 320-22, 330-31; Price Decl. ¶ 32.)

Price's increased religiosity also manifested itself in several ways at his workplace.  He alleges that his religiosity aroused antagonism from Podell, who is Jewish but does not follow the teachings of Chabad or all of the religious practices that Price did during the relevant period.  (*See* Podell Dep. at 239-49.)  The incidents comprising the basis for that allegation are detailed below.

## A.  Instruction To Move *Siddurs* and To Keep the Workplace Neutral

In mid-2005, Price brought three or four *siddurs* (prayer books) to his cubicle.  (Price Decl. ¶ 37; *see also* Price Dep. at 263.)[1]  Price would read from the *siddurs* at work during the day whenever he felt the need to be comforted.  (Price Dep. at 342.)  According to Price, when Podell spotted the *siddurs* at Price's cubicle, she told him to move them out of sight.  (Price Decl. ¶ 37; Price Dep. at 263.)  Podell denies that she knew that Price had *siddurs* or that she told him to keep them out of sight.  (Podell Dep. at 262-63.)

---

[1] Defendants have objected to nearly every paragraph of the Price Declaration on the grounds that the paragraph either does not comport with Fed. R. Civ. P. 56(c) or contradicts Price's prior testimony.  (*See* Defs.' Reply at 3-4; Objections to Plaintiff's Declaration and Exhibits ("Defs.' Objs.") at 1-8.)  Rule 56(c)(4) provides: "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  And "a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony."  *Hayes v. New York City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996).  "If, however, the allegations in the affidavit, rather than contradicting, explain or amplify prior deposition testimony, then the affidavit may create a genuine issue of material fact sufficient to defeat summary judgment."  *Id.*  Defendants' objections to the Price Declaration are generally cursory, stating, for example, that the paragraph is "speculative" or that Price "lacks personal knowledge" of the contents of the paragraph.  (*See, e.g.*, Defs.' Objs. at 1.)  Where the Court cites a paragraph to which defendants object, defendants' objection has been found unpersuasive.  For example, here, defendants objected to paragraph 37 on the grounds that it contradicted plaintiff's testimony on page 263.  Defendants, however, failed to identify the contradiction, and the Court fails to see one.  (*Compare* Price Decl. ¶ 37 ("In the middle of 2005, I brought three or four *siddurs* (prayerbooks in Hebrew) to my cubicle, which I used in praying.  When Podell saw one of the *siddurs*, openly displayed, she demanded that I move it out of sight.") *with* Price Dep. at 262-63 ("Q: All right.  Could you please explain to me what happened with the siddurs?  A: Joanne Podell told me take the siddurs down from—I have—I'm sitting in a cubicle.  Q: Uh-huh.  A: And she told me to take it down, because she didn't want people to see it.  Q: How many siddurs were there?  A: Three or four, regular size books.").)

According to Price, Podell also made two comments at other times in 2005 disparaging him for his failure to keep the workplace neutral.  First, Podell told Price, "You have to be generic," raised her pocketbook, and said, "This is what people respect."  (Price Decl. ¶ 38.) And second, Podell reprimanded Price about a discussion he had with a client from Singapore regarding Chabad doctrine, saying that he should limit his discussions to business.  (*Id.* ¶ 39.) Again, Podell denies telling Price that he had to keep the workplace neutral.  (Podell Dep. at 262-63.)

### B.  E-mails During Rosh Hashanah

Noah's funeral took place on October 2, 2005.  (Defs.' Rule 56.1 Stmt. ¶ 66.)  After the funeral, Price desired to return to work as soon as possible to help distract him from thoughts of his son.  (*Id.* ¶ 68.)  However, Rosh Hashanah was observed for the three days following the funeral, and Price did not go to work during that time.  (*Id.* ¶ 69.)  Price testified that he requested not to receive e-mails on Rosh Hashanah, but nevertheless received e-mails from Podell during that time.  (Price Dep. at 510-11, 514-15; *see also* Reingold Decl. at 65; Moore Decl. Ex. 52.)  Afterwards, Price had a conversation with Podell in which he informed her that he "didn't appreciate that she sent the e-mails," to which Podell responded by saying "get out of my office or something to that effect."  (Price Dep. at 514-15.)  Podell denies that Price requested not to receive e-mails on Rosh Hashanah.  (Podell Dep. at 269.)

### C.  Instruction To Shave

As part of the Jewish mourning process, Price was not supposed to shave for one month following his son's death.  (Price Dep. at 524; Price Decl. ¶ 42.)  At some point during this period, Podell informed Price that his unshaven look did not "present well."  (Price Dep. at 568.) Price explained that he was not supposed to shave, and Podell told him that if that were the case,

she would not take him to any meetings.  (Price Dep. at 568; Price Decl. ¶ 42.)  Eventually, Price

did shave as a result of this interaction.  (Price Dep. at 569.)  Podell denies that she told Price

that he could not attend business meetings unless he shaved.  (Podell Dep. at 267-68.)

### D.  Comment Regarding *Kapparot*

Price also testified that sometime in October 2005, Podell told him that *kapparot*, a

Chabad religious ritual, was a "barbaric" practice.  (Price Dep. at 576.)  Podell denies making

this comment.  (Podell Dep. at 255-56.)

### E.  Interference with Price's Praying at His Synagogue

Prior to Noah's death, Price usually arrived at work at 8:00 a.m. or earlier.  (Price Dep. at

411-412.)  After Noah's death, Price attended the Chabad temple before work, saying the

traditional mourning prayers, the *kaddish*.  (*See* Price Decl. ¶ 43.)  This resulted in a later usual

arrival time, around 8:30 to 9:00 a.m.  (*See* Defs.' Rule 56.1 Stmt. ¶ 77; Price Decl. ¶ 44; Price

Dep. at 413.)  When he attended these services, he wore *tefillin*, a small leather box with straps

holding parchment from sections of the Torah, which a Jewish mourner is to wear for nine

months after a loved one's passing.  (*Id.*)

A few weeks after Noah's death, Price arrived one day at work at 9:15 a.m. (the "Late

Arrival Incident").  (Price Decl. ¶ 44; Price Dep. at 414-15.)  That morning, Podell had been

looking for some paperwork and had contacted Price.  (*See* Defs.' Rule 56.1 Stmt. ¶ 82; *see also*

Podell Dep. at 270; Price Dep. at 541.)  Price, however, had not turned on his cell phone that

morning until he arrived in the office and therefore never responded to Podell's e-mails or phone

calls.  (Defs.' Rule 56.1 Stmt. ¶¶ 80, 81.)

When he arrived at work, Podell asked him why he had not arrived earlier.  (Price Decl.

¶ 44; Podell Dep. at 271-72.)  Price informed her that he had been praying.  (Price Decl. ¶ 44;

Podell Dep. at 272.)  According to Price, Podell then told him to "[p]ray at night."  (*Id.*)  Price told her that he could not because *tefillin* can only be worn in the morning, and Podell then said, "We can't have this anymore, if you want to work for me."  (*Id.*; Price Dep. at 538-40.)  As she said this, she made a chopping motion with one hand onto the other.  (Price Decl. ¶ 44; Price Dep. at 539-40.)  Podell denies that these events took place.  (Podell Dep. at 272-73.)

After this incident, Price began attending a non-Chabad temple in New Jersey that offered services at an earlier hour.  (Price Decl. ¶ 49; *see* Price Dep. at 260, 527, 534, 543.)  Members of the Chabad temple to which Price belonged, including the rabbis, withdrew their support of Price as a result of Price's switch to a non-Chabad temple.  (Price Decl. ¶ 49; *see also* Price Dep. at 544-46.)

### F.  Denial of Permission To Hang a *Mezuzah*

In November 2005, Price wanted to hang a *mezuzah*, a parchment with Torah verses, in his cubicle; brokers at Cushman kept various personal items hanging on their cubicle walls.  (Price Decl. ¶ 53; Price Dep. at 350-51.)  A *mezuzah* is usually kept on a doorway or entrance to a home or other entryway.  (Defs.' Rule 56.1 Stmt. ¶ 87.)  Price desired to have one at his cubicle as something Jewish to give him comfort, and also because of its "religious aspect" of blessing his work area.  (Defs.' Rule 56.1 Stmt. ¶ 88; Price Dep. at 357-58; Price Decl. ¶ 53.)  Price testified that he asked Podell if he could hang the *mezuzah* in his cubicle, but that she refused.  (Price Dep. at 351-52, 550.)  He then asked Veronica Schaefer, an assistant facilities manager with Cushman if he could put a *mezuzah* up, and she also rejected his request.  (*Id.* at 351-52, 554-55; *see also* Defs.' Rule 56.1 Stmt. ¶ 25.)  Price testified that he did this in Podell's presence.  (*Id.*)  Podell denies that she was present for Price's request to Schaefer.  (Burke Affir. Ex. U ("Podell Aff.") ¶ 23.)

### G. Interruptions of Price's Prayers

Both before and after Noah's death, Price prayed during breaks at Cushman's offices. (Price Decl. ¶ 50.) After Noah's death, Price prayed the *kaddish* multiple times a day. (Price Dep. at 448-49.) According to Price, Podell interrupted his *kaddish* prayers twice in the period between Noah's death and when he stopped working with Podell. (*Id.* at 462-63.) Price performed the prayer standing, rocking gently back and forth with his feet together, and while facing east. (*Id.* at 346.) On the first occasion, Podell asked Price for a file while he was praying. (*Id.* at 463.) Price did not respond right away because of his belief that one is supposed to give *kaddish* complete attention and not speak to others during the prayer. (*Id.* at 464-65; *see also* Price Decl. ¶ 51.) When Price finished praying, he told Podell that he was saying *kaddish*, that she was not supposed to interrupt, and that he would not speak during the prayer. (Price Dep. at 465.) On the second occasion, Podell asked for a file, and when Price did not respond, she continued to prompt him to respond. (*See* Price Dep. at 466.) After he had finished praying, Price told Podell that he had already informed her that he could not be interrupted during *kaddish*. (*Id.*) Podell denies ever interrupting Price during his prayers. (Podell Dep. at 266.)

### IV. Commission-Splitting Dispute

In early 2006, Price and Podell had a dispute about the commissions that Price would receive from a pending deal regarding Home Depot.[2] (Podell Dep. at 238-39, 286-89.) Price believed that he was entitled to a flat 20% commission on the deal, whereas Podell thought Price's commissions would be adjusted to meet a goal of $200,000 total annual compensation. (*See id.*; *see also* Price Decl. ¶ 57.) A flat 20% commission on the Home Depot deal would have, by itself, earned Price well over $200,000. (*See* Podell Dep. at 288-89; Moore Decl. Ex. 19 at 2.)

---

[2] The Home Depot deal ultimately did not materialize. (Defs.' Rule 56.1 Stmt. ¶ 97.)

In March 2006, Podell e-mailed Price, proposing a commission-splitting arrangement under which Price would receive 20% of the first $1 million of commissions, 15% of the next $500,000, 10% of the $500,000 above that, 8% of the next $500,000, 6% of the $500,000 above that, and 2% on any commissions over $3 million. (Burke Affir. Ex. V.) In addition, the proposal noted that any deals that Price brought in would be split 50/50. (*Id.*)

Price, upset about Podell's proposed commission-splitting arrangement, sought the assistance of Dennis Waggner, Cushman's Managing Director for the New York tri-state region. (*See* Price Decl. ¶ 58; Moore Decl. Ex. 31; *see also* Burke Affir. Ex. P ("Waggner Dep.") at 25-26.) Waggner e-mailed Price on March 31, 2006, suggesting that Price seek the assistance of Suzy Reingold, Cushman's Executive Managing Director for New York City. (Price Decl. ¶ 58; Moore Decl. Ex. 31; *see also* Defs.' Rule 56.1 Stmt. ¶ 17.)

On April 5, 2006, Price e-mailed Reingold asking for a private meeting in which they could discuss Podell's proposal. (Defs.' Rule 56.1 Stmt. ¶ 100; Burke Affir. Ex. Y.) On April 10, 2006, Price and Reingold met to discuss Price's concerns with the proposal. (Burke Affir. Ex. K ("Reingold Dep.") at 102-03.)[3] On April 17, 2006, Podell e-mailed Reingold, copying Price, indicating that Price had rejected her proposal, that she sought to rescind it, and she was replacing the proposal with her consent "to the $200,000 promised earlier in his tenure." (Burke Affir. Ex. X.)

Reingold held a meeting on April 26, 2006, with Price, Podell, and Tani Brown,[4] Cushman's Director of Retail Services, to discuss Price's dissatisfaction with Podell's proposal and the future financial arrangement between Price and Podell. (Defs.' Rule 56.1 Stmt. ¶¶ 19,

---

[3] Defendants' Rule 56.1 Statement ¶ 101, which Price admits, indicates that this meeting happened on April 17, 2006, and cites to Reingold's deposition testimony, but Reingold testified therein that the meeting happened on April 10. (*Compare* Defs.' Rule 56.1 Stmt. ¶ 101 *with* Reingold Dep. 102-03.)

[4] Brown later changed her last name to Gelber. The name "Tani Brown" is used in this Opinion for clarity's sake.

103.)  At the meeting, Price reiterated his position that he and Podell had an agreement under which he would receive 20% of the commission on deals that she originated.  (*See* Price Decl. ¶ 62; Reingold Dep. at 115.)  Thus, Podell's proposal was unacceptable to him, and he informed Reingold that he could no longer work with Podell.  (Price Decl. ¶ 62; Reingold Dep. at 115.)

On May 3, 2006, Price sent a memo to Reingold memorializing his understanding of the commission-sharing agreement, itemizing the commission splits that had occurred between Podell and Price to that point, requesting that future commissions be split on an 80%-20% basis, and noting Price's "understanding . . . that the next step will require a recommendation from senior management prior to in-house arbitration."  (Burke Affir. Ex. Z.)  He sent a similar memo to Joseph Harbert, Cushman's Chief Operating Officer for the New York Metro region, on June 5, 2006.  (*See* Burke Affir. Ex. NN; Defs.' Rule 56.1 Stmt. ¶ 16.)  At some point, Reingold chose to resolve the commission-sharing issue with a "management decision," a "firm and binding" decision as to what should be done, as opposed to a "recommendation," although she had told Price that she would make a recommendation.  (Reingold Dep. at 132-34.)  On May 18, 2006, Reingold informed Price that she would be making a management decision in lieu of arbitration. (Price Dep. at 710; Price Decl. ¶ 66; *see also* Reingold Dep. at 172.)  Price spoke with Kenneth Goldstein, Cushman's Assistant General Counsel and Assistant Secretary, about his arbitration rights, and Goldstein informed him that Price's employment contract reserved to Cushman the right to resolve the commission dispute by way of a management decision instead of arbitration. (Defs.' Rule 56.1 Stmt. ¶¶ 22, 111.)

On June 16, 2006, Reingold issued a decision which purported to resolve the commission dispute.  (Burke Affir. Ex. AA.)  Reingold reviewed nine deals that all involved Podell's clients, except for one, a North Face deal; North Face was a client of another senior retail broker who

paid Podell and Price. (Defs.' Rule 56.1 Stmt. ¶¶ 115-117.) For all transactions other than the North Face deal, Reingold awarded Price commission shares of between one and five percent of the total commission. (Burke Affir. Ex. AA.)

### V. Price's Complaints

During the course of these events, Price complained on several occasions to others at Cushman about perceived unfair treatment. For example, according to Price, on the day of the Late Arrival Incident, he was upset and crying when he explained to Tani Brown just after the incident that Podell had threatened to fire him and would not let him keep his *siddurs* in view, and asked Brown whether Podell could fire him. (Price Dep. at 598-601; Price Decl. ¶ 45.) Brown said that she would "take care of it." (Price Dep. at 600; Price Decl. ¶ 45.) According to Brown, Price did have a conversation with her, but said only Podell was "upset," and did not mention the *siddurs* or the threat of termination. (Burke Affir. Ex. L ("Brown Dep.") at 60-61, 69-72.)

About a week after that, Price says that he went to see Grace Ben-Ezra, who was the Assistant Director of Employee Relations at the time, and told her about the Late Arrival Incident. (Price Decl. ¶ 47; *see also* Price Dep. at 588-90; Defs.' Rule 56.1 Stmt. ¶¶ 23, 24.) Ben-Ezra does not recall this conversation happening and therefore did not take any action in response to it. (Burke Affir. Ex. N ("Ben-Ezra Dep.") at 87-90.) According to Price, he also sought Ben-Ezra's assistance on April 11, 2006, about Podell's proposed commission-splitting arrangement. (Price Decl. ¶ 59; Price Dep. at 591-95.) Price asked her if Podell "was acting this way because of [his] Chabad observances," and reminded Ben-Ezra of the Late Arrival Incident, to which Ben-Ezra's response was only to ask, "But isn't she [Podell] Jewish?" (*Id.*; *see also* Price Dep. at 594-95.) Ben-Ezra testified that she recalled meeting with Price on that date, but

that the conversation only concerned the issue of commissions, and that she referred him to his "manager, whoever that was at the time."  (Ben-Ezra Dep. at 111-13.)

Price also tried to enlist the support of Gene Spiegelman, an Executive Director at Cushman who lead his own team, on April 17, 2006, by sending him an e-mail advising him that Podell had rescinded her commission-splitting proposal and that "her new offer [was] $200,000." (Moore Decl. Ex. 54.)  Spiegelman replied that it was not his place to get involved in this dispute and referred it to Tony Marano, Cushman's CEO for North America.  (*Id.* Ex. 55; Defs.' Rule 56.1 Stmt. ¶ 15.)  Marano, in turn, suggested that Price listen to what Reingold had to say.  (Price Decl. ¶ 61.)

Price also complained to Edward Weiss, Cushman's vice chairman in brokerage.  (Price Dep. at 642; Burke Affir. Ex. Q ("Weiss Dep.") at 60.)  Price testified that he told Weiss about Reingold's refusal to allow Price to arbitrate his commission-splitting dispute and about the Late Arrival Incident.  (Price Dep. at 642.)  Weiss testified that he recalled only that he discussed the arbitration dispute with Price.  (*See* Weiss Dep. at 60-64.)

Price also testified about a meeting between him and Reingold that followed his May 3, 2006 memorandum.  (Price Dep. at 646-53; Price Decl. ¶ 65.)  There, Reingold informed him that Podell had told her that on four deals for which Price felt he deserved compensation, Price deserved none because these deals had been done at Newmark, her prior employer.  (Price Dep. at 646-47.)  Price then told Reingold that Podell was a liar and that Podell would not "even allow me to pray in the morning, put the *tefillin* on to my son."  (*Id.* at 647-50.)

**VI.  Price's Attempts To Access Files and His Move to the Eighth Floor**

On April 28, 2006, after Price had stopped working with Podell, he e-mailed Podell to ask for access to a file he required for a meeting.  (*See* Moore Decl. Ex. 22.)  Podell did not

respond until after the meeting took place.  (*See id.*)  Price and Podell continued to dispute

Price's ability to access files for several days.  On May 3, 2006, Podell denied a request for "files

in JP Share marked 'Mark Price' and 'Mark Price temp,'" telling Price that she was "not

prepared to provide [him] with any additional files at this time."  (*Id.* Ex. 23.)  Price then e-

mailed Reingold in an attempt to gain access, telling Reingold that Podell was "trying to cripple

my work."  (*Id.* Ex. 24.)  On May 19, 2006, Price sought and obtained Brown's assistance in

gaining access to the files.  (*Id.* Ex. 25.)

On June 29, 2006, Cushman moved Price from the tenth to the eighth floor.  (Defs.' Rule

56.1 Stmt. ¶ 131.)  Prior to that, Price had used a computer code that Podell had given him while

they were working together to check the status of certain deals on Cushman's system.  (Price

Dep. at 493-94.)  Cushman stated as the reason for its decision to move Price reports of Price's

disruptive behavior on the tenth floor, including complaining about Cushman's handling of his

commission-splitting dispute and his use of Podell's computer code.  (*See* Reingold Dep. at 222-

23; Brown Dep. at 191-92.)

## VII.    Working with Robert Mitchell

After he stopped working with Podell, Price worked on a deal with Robert Mitchell,

another broker at Cushman, that closed within two months.  (Price Dep. at 611-12.)  Price

testified that when Mitchell informed Brown that he had worked on the deal with Price, Brown

discouraged Mitchell from giving work to Price directly, telling him that deals had to go through

her, as she was "the one that has to designate who's the best person for that job."  (*Id.* at 612.)

Brown does not recall discouraging Mitchell from working with Price.  (Brown Dep. at 190-91.)

**VIII.   Price's Appeal of Reingold's Decision and Price's Termination**

Price was upset about the percentages Reingold allotted him, and asked Harbert and Marano to override the decision.  (Defs.' Rule 56.1 Stmt. ¶¶ 126, 129.)  On July 14, 2006, Price met with Harbert at Marano's suggestion.  (Price Decl. ¶ 74; Harbert Dep. at 120-21; *see* Moore Decl. Ex. 56.)  Harbert recalls that during this conversation, they talked about the unfairness Price perceived in Reingold's decision, about a deal that Price contended was undisputed and yet unpaid (the "137 Wooster Deal"), and about Price's son.  (Harbert Dep. at 124-25.)  Harbert agreed to meet again and that he would look into the "commission issue where he was owed money."  (*Id.*)  Price also contends that he requested arbitration at this meeting.  (Price Decl. ¶ 74.)

On September 14, 2006, Price e-mailed Harbert requesting quick resolution of the commission dispute and immediate payment of commissions on the 137 Wooster Deal.  (Moore Decl. Ex. 39.)  On September 26, 2006, Price had an animated conversation with Harbert; he testified that he discussed Podell's alleged retaliatory and discriminatory acts in that conversation.  (Price Dep. at 658-66; *see also* Harbert Dep. at 165.)  Ultimately, Harbert and Marano affirmed Reingold's decision.  (Defs.' Rule 56.1 Stmt. ¶ 129.)

Reingold decided to terminate Price.  (*See* Harbert Dep. at 212 ("Q: Who made the decision to terminate Mr. Price?  A: Suzy [Reingold].")  Price was advised of his termination at an October 23, 2006 meeting with Goldstein, Waggner, and Carol Giardina, a manager in human resources.  (Defs.' Rule 56.1 Stmt. ¶ 150.)  At the meeting, Price asked Waggner why he was being terminated, and Waggner replied simply that he was an "employee at will."  (Price Decl. ¶ 82.)  A letter dated with the same date and signed by Waggner informed Price that he would be terminated effective November 6, 2006 "[i]n accordance with the terms of your contract with

14

Cushman & Wakefield, Inc." (Moore Decl. Ex. 57.) The letter did not specify a particular

reason for the termination. (*See id.*)

Price filed a complaint with the Equal Employment Opportunity Commission ("EEOC")

on July 24, 2007. (Burke Affir. Ex. CC.) This action followed on October 16, 2008.

## DISCUSSION

### I. Summary Judgment Standard

Summary judgment is proper if the moving party shows that "there is no genuine issue as

to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ.

Proc. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "In deciding whether there

is a genuine issue of material fact as to an element essential to a party's case, the court must

examine the evidence in the light most favorable to the party opposing the motion, and resolve

ambiguities and draw reasonable inferences against the moving party." *Abramson v. Pataki*, 278

F.3d 93, 101 (2d Cir. 2002) (internal quotation marks omitted); *see also Anderson v. Liberty

Lobby, Inc.*, 477 U.S. 242, 255 (1986). The moving party must demonstrate that no genuine

issue exists as to any material fact. *Celotex*, 477 U.S. at 323–25. As to an issue on which the

non-moving party bears the burden of proof, "the burden on the moving party may be discharged

by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to

support the nonmoving party's case." *Id.* at 325 (rejecting a construction of Rule 56(c) that

would require the party moving for summary judgment to produce evidence affirmatively

establishing the absence of a genuine issue of material fact with respect to an issue on which the

nonmoving party bears the burden of proof).

If the moving party makes such a showing, the "non-movant may defeat summary

judgment only by producing specific facts showing that there is a genuine issue of material fact

for trial." *Samuels v. Mockry*, 77 F.3d 34, 36 (2d Cir. 1996); *Celotex*, 477 U.S. at 322–23.  In

seeking to show that there is a genuine issue of material fact for trial, the non-moving party

cannot rely on mere allegations, denials, conjectures or conclusory statements, but must present

affirmative and specific evidence showing that there is a genuine issue for trial.  *See Anderson*,

477 U.S. at 256–57; *Gross v. Nat'l Broad. Co.*, 232 F. Supp. 2d 58, 67 (S.D.N.Y. 2002).

## II.  Procedural Arguments

Defendants raise two procedural arguments that they contend bar some of Price's claims.

First, defendants argue that most of Price's Title VII claims based on discrete acts are time-

barred.  And second, defendants argue that consideration of Price's disparate-treatment claims is

improper on summary judgment because it was not pled in the complaint.

### A.  Title VII's Statute of Limitations

"Title VII's administrative exhaustion provision requires that any complaint be filed with

the EEOC within 300 days of the alleged discriminatory act."  *McGullam v. Cedar Graphics,*

*Inc.*, 609 F.3d 70, 75 (2d Cir. 2010).  Filing a complaint within this period is "a precondition to

filing a Title VII claim in federal court."  *Deravin v. Kerik*, 335 F.3d 195, 200 (2d Cir. 2003).

Because Price filed his EEOC complaint on July 24, 2007, only acts alleged to have occurred on

or after September 27, 2006, would be timely under the statute.

"When, as in this case, a plaintiff's allegations of discrimination extend beyond the 300-

day limitations period, the nature of the claim determines what consideration will be given to the

earlier conduct."  *Petrosino v. Bell Atlantic*, 385 F.3d 210, 220 (2d Cir. 2004).  "With respect to

claims based on termination, failure to promote, denial of transfer, or refusal to hire, section

2000e-5(e)(1) precludes recovery for *discrete* acts of discrimination or retaliation that occur

outside the statutory time period, even if other acts of discrimination occurred within the

statutory time period." *McGullam*, 609 F.3d at 75 (internal citations and quotation marks

omitted) (emphasis in original).  Such claims must be alleged to have occurred within the 300-

day period.  *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002).

But "[h]ostile environment claims are different in kind from discrete acts. Their very

nature involves repeated conduct.  The 'unlawful employment practice' therefore cannot be said

to occur on any particular day." *Morgan*, 536 U.S. at 115 (internal citation omitted).  Therefore,

"consideration of the entire scope of a hostile work environment claim, including behavior

alleged outside the statutory time period, is permissible for the purposes of assessing liability, so

long as an act contributing to that hostile environment takes place within the statutory time

period." *Id.* at 105.

Defendants argue that Price's Title VII claims based on discrete acts occurring before

September 27, 2006 are time-barred under the statute; the only act alleged that occurred after that

date is Price's termination.  Price does not argue that any of the discrete acts are timely; rather,

he argues only that consideration of them is proper as part of his hostile work environment claim.

(*See* Pl.'s Opp'n at 40-42.)  Accordingly, summary judgment is granted for defendants on Price's

discrete-act Title VII claims of disparate treatment, apart from Price's termination.[5]

---

[5] Those claims are discrimination claims based on: (1) Podell's interference with his morning prayers at the Chabad temple; (2) her abandonment of the 80%-20% commission-sharing arrangement; (3) the "forced departure" of Price from Podell's retail team; (4) Reingold's management decision on the commission dispute; (5) Price's move to the eighth floor; and (6) Cushman's failure to follow up on Price's claims of discrimination, as well as retaliation claims based on: (1) Reingold's decision about the commission-splitting arrangement; (2) the denial of Price's request to arbitrate; (3) the move of Price to the eighth floor.  As discussed below, Price's hostile work environment claim survives.

Price argues in his opposition papers that his claims under the NYSHRL and NYCHRL are timely "[s]ince [Price's] EEOC filing was made on July 24, 2007, and all of Price's claims of discrimination arose in fall of 2005 to present."  (*See* Pl.'s Opp'n at 41.)  "Those statutes 'each have three-year statute of limitations periods ... [, which are] tolled during the period in which a complaint is filed with the EEOC.'" *Ezuma v. City University of New York*, 665 F. Supp. 2d 116, 119 (E.D.N.Y. 2009) (quoting *Siddiqi v. New York City Health & Hosps. Corp.*, 572 F. Supp. 2d 353, 373 (S.D.N.Y. 2008)).  As such, Price appears to be correct, but because defendants have not actually argued that these claims are untimely, these arguments are misplaced.

Defendants argue that if no federal claims survive summary judgment, then the Court should decline to exercise jurisdiction over the state and city-law claims as well, pursuant to 28 U.S.C. § 1367(c)(3).  (Defs.' Mem. at

**B. Pleading**

Defendants argue that consideration of Price's disparate-treatment claim is improper because the claim was not alleged in the complaint.  "Because a failure to assert a claim until the last minute will inevitably prejudice the defendant, courts in this District have consistently ruled that 'it is inappropriate to raise new claims for the first time in submissions in opposition to summary judgment.'"  *Beckman v. U.S. Postal Service*, 79 F. Supp. 2d 394, 407 (S.D.N.Y. 2000) (quoting *Bonnie & Co. Fashions, Inc. v. Bankers Trust Co.*, 170 F.R.D. 111, 119 (S.D.N.Y. 1997)).  "Although a complaint need not correctly plead every legal theory supporting the claim, at the very least, plaintiff must set forth facts that will allow each party to tailor its discovery to prepare an appropriate defense."  *Id.* (internal citations omitted).

Defendants cite a single case in support of their argument, *Le Prevost v. New York State*, No. 03 Civ. 2544 (DAB), 2009 WL 856999 (S.D.N.Y. Mar. 31, 2009).  There, the plaintiff moved to amend her complaint to add claims for disparate impact and disparate treatment.  2009 WL 856999, at *9.  The court denied her leave to amend because defendants suffered prejudice in having to prepare for additional motion practice, because moving to amend three years after the completion of discovery raised "the disturbing possibility that Plaintiff has invoked these new claims at this time in bad faith," and because "the fact that all of Plaintiff's other causes of action have been determined finally not in her favor" strongly supported "the futility of a further amendment."  *Id.*   Similarly, in *Kearney v. County of Rockland*, 373 F. Supp. 2d 434 (S.D.N.Y. 2005), the court refused to consider plaintiff's Title VII hostile work environment claim, first asserted in her opposition to defendants' motion for summary judgment, because the "allegation

---

46.)  But as Price points out, this Court has jurisdiction over the state and city-law claims under its diversity jurisdiction pursuant to 28 U.S.C. § 1332.  (Pl.'s Opp'n at 41-42; *see also* Compl. ¶ 7.)  Thus, even if all the federal claims were dismissed, declining to exercise jurisdiction over the remaining state and city-law claims would be improper.

was not made in plaintiff's Complaint or her EEOC charge," which mainly alleged age discrimination.  In these cases, asserting the new Title VII claims at the "last minute" certainly prejudices the defendants.

The same cannot be said in this case.  Defendants do not point out any particular prejudice that they will suffer as a result of the Court considering Price's disparate-treatment claims, and it can hardly be said that the claim constitutes unfair surprise when defendants, in their own reply memo, argue that they "have already demonstrated that discriminatory animus played no part in [all of] Price's alleged adverse employment actions," save one, in their moving memorandum.  (Defs.' Reply at 7.)  The Court, therefore, will consider Price's disparate-treatment claims.

### III. Discrimination Claims

Price asserts three different bases for discrimination in violation of Title VII, the NYSHRL, and the NYCHRL: disparate treatment, hostile work environment, and failure to accommodate.  Defendants have moved for summary judgment under all three theories.

### A. Disparate Treatment

### 1. Standards To Apply

### a. Federal and State Law

Under Title VII and the NYSHRL, "[d]iscrimination claims may be analyzed under either the *Price-Waterhouse* 'mixed motive' analysis or the *McDonnell-Douglas* 'burden shifting' framework."[6]  *Dixon v. Int'l Fed'n of Accountants*, No. 09 CV 2839 (HB), 2010 WL 1424007, at *3 (S.D.N.Y. Apr. 9, 2010).  Price contends that the mixed-motive framework outlined in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), is appropriate in this case.  "The types of indirect

---

[6] Courts "review discrimination claims brought under the NYSHRL according to the same standards that we apply to Title VII discrimination claims."  *Pucino v. Verizon Wireless Commc'ns, Inc.*, 618 F.3d 112, 117 n.2 (2d Cir. 2010).

evidence that suffice in a pretext case to make out a prima facie case—or even to carry the

ultimate burden of persuasion [when analyzed pursuant to the framework of *McDonnell Douglas*

*Corp. v. Green*, 411 U.S. 792, 802 (1973)]—do 'not suffice, even if credited, to warrant' a *Price*

*Waterhouse* burden shift." *Raskin v. Wyatt Co.*, 125 F.3d 55, 60 (2d Cir. 1997) (quoting

*Ostrowski v. Atlantic Mut. Ins. Cos.*, 968 F.2d 171, 182 (2d Cir. 1992)).  "Evidence potentially

warranting a *Price Waterhouse* burden shift includes, *inter alia,* policy documents and evidence

of statements or actions by decisionmakers that may be viewed as *directly reflecting* the alleged

discriminatory attitude."  *Id.* at 60-61 (internal quotation marks omitted) (emphasis in original).

"[T]o warrant a mixed-motive burden shift, the plaintiff must be able to produce a 'smoking gun'

or at least a 'thick cloud of smoke' to support his allegations of discriminatory treatment."  *Id.* at

61.  "Where . . . the plaintiff fails to produce any such evidence, the plaintiff cannot withstand a

motion for summary judgment by arguing that a jury might reasonably find in his favor under the

mixed-motives framework."  *Gant ex rel. Gant v. Wallingford Bd. of Educ.*, 195 F.3d 134, 146

n.16 (2d Cir. 1999).

     Price identifies nine pieces of evidence that he contends are direct evidence warranting a

*Price Waterhouse* burden-shifting framework: (1) Podell's description of a Chabad practice as

"barbaric"; (2) her order to Price to remove his *siddurs* to keep his space "neutral"; (3) her telling

Price that he had to be "generic"; (4) her becoming upset over Price's discussions with a client

from Singapore about Chabad; (5) her e-mailing Price on Rosh Hashanah; (6) her complaints

about Price's unshaven look; (7) the Late Arrival Incident; (8) her interruption of Price's prayers;

and (9) her refusal to allow Price to hang a *mezuzah* at his desk.  (Pl.'s Opp'n at 27-28.)  Price

does not offer any particular reasoning behind his assertion that these pieces of evidence are

direct evidence; neither do defendants in their argument that they are not.  (*See* Pl.'s Opp'n at 27-28; Defs.' Reply at 7.)

The Second Circuit has noted that "[a]n employer who discriminates is unlikely to leave a 'smoking gun,' such as a notation in an employee's personnel file, attesting to a discriminatory intent." *Rosen v. Thornburgh*, 928 F.2d 528, 533 (2d Cir. 1991).  "A victim of discrimination is therefore seldom able to prove his or her claim by direct evidence and is usually constrained to rely on the cumulative weight of circumstantial evidence." *Id.*  Thus the existence of direct evidence in a case has been termed "a rare exception." *Bateman v. Project Hospitality, Inc.*, No. 07-CV-2085 (RRM)(RML), 2009 WL 3232856, at *8 (E.D.N.Y. Sept. 30, 2009); *see also Sulehria v. City of New York*, 670 F. Supp. 2d 288, 305 (S.D.N.Y. 2009) ("Direct evidence that the adverse employment action was motivated by discrimination, 'a smoking gun,' is typically unavailable, however.").

The Court finds that the "rare exception" does not apply in this case.  The one case that plaintiff cites, *Venters v. City of Delphi*, 123 F.3d 956 (7th Cir. 1997), is distinguishable.  There, the supervisor who fired the plaintiff was one, according to plaintiff's evidence, "who repeatedly threatened her with discharge if she did not play by 'God's rules' and who ultimately did discharge her when she did not mend her sinful ways." 123 F.3d at 974.  Plaintiff also alleged that the supervisor had said "that an 'evil spirit' had taken her soul which he would not allow to inhabit the department." *Id.* at 973-74.  Price's evidence does not show the same sort of direct causal connection between a discriminatory motive and an adverse employment action present in *Venters*; for example, although Price points to Podell's chopping motion, which could be interpreted as threatening termination for continued late arrivals after morning prayer services,

Podell did not ultimately terminate Price.  The Court therefore applies the *McDonnell Douglas* framework.

"Under *McDonnell Douglas,* a plaintiff must first make out a *prima facie* case, *i.e.,* she 'must demonstrate the following: (1) she was within the protected class; (2) she was qualified for the position; (3) she was subject to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination.'"  *United States v. Brennan*, --- F.3d ----, 2011 WL 1679850, at *20 (2d Cir. May 5, 2011) (quoting *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 498 (2d Cir. 2009)).  "Once the *prima facie* case has been shown, 'the burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason' for the adverse employment action."  *Id.* (quoting *McDonnell Douglas*, 411 U.S. at 802).  "The burden then shifts back to the plaintiff 'to show that [the defendant's] stated reason for [the adverse employment action] was in fact pretext.'"  *Id.* (quoting *McDonnell Douglas*, 411 U.S. at 804).

### b.  City Law

"[C]laims under the City HRL must be given 'an independent liberal construction' . . . . "  *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009) (quoting *Williams v. New York City Hous. Auth.*, 872 N.Y.S.2d 27, 31 (N.Y. App. Div. 2009)).  Under the NYCHRL, "the primary issue for a trier of fact . . . is whether the plaintiff has proven by a preponderance of the evidence that she has been treated less well than other employees because of her [protected status]."  *See Williams*, 872 N.Y.S.2d at 39.  Even so, "the broader purposes of the City HRL do not connote an intention that the law operate as a 'general civility code.'"  *Id.* at 40.  Accordingly, defendants in NYCHRL suits have an affirmative defense "if they prove that the conduct complained of consists of nothing more than what a reasonable victim of discrimination

22

would consider 'petty slights and trivial inconveniences.'"  *Id.* at 41.  This defense "target[s] concerns about truly insubstantial cases, while at the same time avoiding improperly giving license to the broad range of conduct that falls between 'severe or pervasive' on the one hand and a 'petty slight or trivial inconvenience' on the other."  *Id.*

## 2.  Application

Price identifies seven events constituting the basis for his disparate-treatment claims: (1) Podell's interference with his morning prayers at the Chabad temple; (2) her abandonment of the 80%-20% commission-sharing arrangement; (3) the "forced departure of Price from Podell's retail team"; (4) Reingold's management decision on the commission dispute; (5) Price's move to the eighth floor; (6) Cushman's "failure . . . to follow up on Price's claims of discrimination"; and (7) his termination.[7]

### a.  Federal and State Claims

For the purposes of this motion, defendants concede that Price meets the first two prongs of the test, *i.e.*, that he is in a protected class (being affiliated with Chabad) and that he was qualified for his position.  (*See* Defs.' Reply at 8.)  They contend, however, that all of the identified events, save termination, do not constitute adverse employment actions.

"An adverse employment action is 'a materially adverse *change* in the terms and conditions of employment.'"  *Mathirampuzha v. Potter*, 548 F.3d 70, 78 (2d Cir. 2008) (quoting *Sanders v. N.Y. City Human Res. Admin.*, 361 F.3d 749, 755 (2d Cir. 2004)) (emphasis in *Mathirampuzha*).  On the adverse employment action prong of the prima facie test, the Second Circuit "require[s] a plaintiff to proffer objective indicia of material disadvantage; 'subjective, personal disappointment[]' is not enough."  *Beyer v. Cnty. of Nassau*, 524 F.3d 160, 164 (2d Cir.

---

[7] As noted, claims (1) through (6) are untimely under federal law, but the NYSHRL applies the same substantive standards as Title VII.  Price's recitation of the seven separate adverse employment actions suggests that he is in fact asserting seven claims of disparate treatment, as "an adverse employment action" is an element of the claim.

2008) (quoting *Galabya v. N.Y. City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000)).

"Employment actions that have been deemed sufficiently disadvantageous to constitute an

adverse employment action include 'a termination of employment, a demotion evidenced by a

decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly

diminished material responsibilities, or other indices . . . unique to a particular situation.'"

*Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 128 (2d Cir. 2004) (quoting *Galabya*, 202 F.3d

at 640). "While adverse employment actions extend beyond readily quantifiable losses, 'not

everything that makes an employee unhappy is an actionable adverse action.'"  *Nakis v. Potter*,

422 F. Supp. 2d 398, 420 (S.D.N.Y. 2006) (quoting *Phillips v. Bowen*, 278 F.3d 103, 117 (2d

Cir. 2002)).

### i.   Failure To Follow Up on Claims of Discrimination, Office Relocation, and Interference with Morning Prayers

These events are time-barred under Title VII and do not constitute adverse employment

actions under the NYSHRL.  Defendants' failure to follow up on Price's claims of discrimination

is not an adverse employment action.  *See, e.g.*, *Hayes v. Kerik*, 414 F. Supp. 2d 193, 203

(E.D.N.Y. 2006) ("Defendants are correct in their contention that plaintiff's allegations . . . that

the DOC failed to properly investigate her 1995 complaint of discrimination[] do[es] not

constitute [an] adverse employment action[].");  *cf. Fincher v. Depository Trust and Clearing*

*Corp.*, 604 F.3d 712, 721 (2d Cir. 2010) (holding in the retaliation context that "an employer's

failure to investigate a complaint of discrimination cannot be considered an adverse employment

action taken in retaliation for the filing of the same discrimination complaint" because "[h]er

situation in the wake of her having made the complaint is the same as it would have been had she

not brought the complaint or had the complaint been investigated but denied for good reason or for none at all").

Neither is the relocation of Price's office an adverse employment action.[8]  *See Pappas v. New York Bd. of Educ.*, No. 07-CV-4312 (FB)(MDG), 2011 WL 128509, at *3 n.3 (E.D.N.Y. Jan. 14, 2011) ("Pappas also alleged that: (1) she was yelled at by her superiors; (2) her office was relocated; (3) she was not included in school photos or yearbooks; (4) she did not receive letters of recognition; and (5) she had her responsibility for organizing Pupil Personnel Meetings taken away from her.  The first four of these alleged acts clearly do not rise to the level of an adverse employment action."); *cf. Cunningham v. New York State Dep't of Labor*, No. 1:05-CV-1127-DNH-RFT, 2010 WL 1781465, at *6 (N.D.N.Y. Apr. 30, 2010) (noting in the retaliation context that "[a]lthough perhaps inconvenient, the relocation of plaintiff's office does not rise to level of an adverse employment action").

Finally, Podell's interference with Price's morning prayers, which, according to Price, came in the form of a veiled threat to fire Price if he continued to arrive late because of the prayers, does not constitute an adverse employment action.  *See Tompkins v. Allied Barton Sec. Servs.*, No. 09 Civ. 1954 (RMB)(JLC), 2010 WL 3582627, at *5 n.6 (S.D.N.Y. Aug. 2, 2010) ("Plaintiff appears further to claim that Bermudez threatened her with termination.  The vast majority of courts in this circuit have held that a threat alone does not constitute an adverse employment action."), *aff'd*, 2011 WL 2210158 (2d Cir. June 8, 2011); *Early v. Wyeth Pharms.,*

---

[8] In his declaration, Price asserts that his move to the eighth floor "den[ied] me access to my assistant and to my colleagues."  (Price Decl. ¶ 70.)  Presumably, that statement is intended to imply that the move made access to his assistant and colleagues more difficult by virtue of physical separation, not that there was some barrier between the eighth and tenth floors that disabled access entirely, given Price's other submissions.  (*See* Pl.'s Rule 56.1 Opp'n ¶ 135 ("Price . . . states he had been assigned an assistant and was unable *to effectively work* with her after the transfer." (emphasis added)); *see also* Reingold Dep. at 228:21-25 ("He had access to an assistant, just on a different floor.").)  In the absence of any elaboration or citation to case law on why the transfer to the eighth floor constitutes an adverse employment action, the Court interprets Price's argument as one about the inconvenience of having been moved to another floor, one which the case law has rejected.

*Inc.*, 603 F. Supp. 2d 556, 574 (S.D.N.Y. 2009) ("A threat is not, by itself, an adverse employment action.  Rather, an adverse employment action must affect ultimate employment decisions such as promotion, wages, or termination."); *Bowles v. New York City Transit Auth.*, Nos. 00 Civ. 4213, 03 Civ. 3073 (BSJ) (MHD), 2006 WL 1418602, at *10 (S.D.N.Y. May 23, 2006) (collecting cases and noting that "[i]n this Circuit, most courts that have faced the issue have decided that an unrealized threat of discipline or termination is not actionable under Title VII"); *cf. Davis v. Verizon Wireless*, 389 F. Supp. 2d 458, 468 (W.D.N.Y. 2005) ("[C]laims involving an unfulfilled threat of adverse employment action should be analyzed . . . as hostile work environment claims.").[9]  Price cites *Faison v. Leonard St., LLC*, No. 08 Civ. 2192 (PKC), 2009 WL 636724 (S.D.N.Y. Mar. 9, 2009), to argue that the Late Arrival Incident does constitute an adverse employment action.  It is true that the court there noted that "[i]n certain circumstances," an adverse employment action "may include 'the threat of discipline or demotion' for missing work in order to attend religious observances."  2009 WL 636724, at *6 (citing *Gueye v. Evans*, No. 04 Civ. 6029 (SHS), 2006 WL 3298427, at *6 (S.D.N.Y. Nov. 13, 2006)).  In that case, however, "the ultimatum allegedly uttered by Eden ('[Y]ou have to make a choice between work and your religion.') was direct and explicit," a fact that the court specifically used to distinguish *Bowles*.  2009 WL 636724, at *6.  Here, the threat allegedly made by Podell was not so direct and explicit, and thus *Faison* is distinguishable.

Summary judgment is therefore granted on the state and federal law claims based on these acts.

---

[9] Of course, Price was actually terminated in the end.  But Podell was not the one to fire Price, Price did not continue in the religious practice to which Podell objected, and Price does not contend that his termination was caused by his attendance at morning prayers.

### ii. Podell's Abandonment of the 80%-20% Arrangement, Price's "Forced Departure" from Podell's Team, and Reingold's "Management Decision"

While claims based on these actions are untimely under Title VII, the second and fourth actions described above relating to Price's commissions constitute adverse employment actions for state-law purposes.  If Price's version of events is believed, both Podell's decision to abandon the alleged 80%-20% commission-splitting agreement and Reingold's management decision to allot significantly less than 20% of commissions over $1 million had the effect of drastically reducing Price's compensation, which qualifies as an adverse employment action.  *See, e.g.*, *Williams*, 368 F.3d at 128.  Defendants contend that "Podell's proposed commission-split goal for 2006 would have doubled Price's potential commission earnings—this is hardly adverse." (Defs.' Mem. at 34.)  But this assumes that the baseline comparator must be Price's commissions for the previous year, and that those commissions must be viewed by absolute amount rather than by percentage of total commissions earned by Podell and Price.  When viewed by the latter baseline, these decisions could constitute adverse employment actions.  The third action, Price's "forced departure," is intimately connected with the commission dispute, as Podell's commission-splitting decision precipitated Price's informing Reingold that he could no longer work with Podell.

Thus, Price has adduced evidence of adverse employment actions in Podell and Reingold's actions in the commission-splitting dispute and his termination.  As for the commission-splitting dispute, defendants relied on their argument that Podell and Reingold's actions were not adverse employment actions and did not argue that the actions did not take place under circumstances giving rise to an inference of discrimination or offer legitimate, non-

discriminatory reasons for those actions.[10]  (*See* Defs.' Reply at 8-9; Defs.' Mem. at 34-35.)

Presumably, the reason for Podell's actions would be that no 80%-20% commission-splitting

arrangement ever existed, which itself is a disputed issue of material fact, and Reingold's actions

would be justified by her stated reason at the time, which was that they were based upon the

"value added" by Price.  (Burke Affir. Ex. AA.)

But there is enough evidence, albeit disputed, for a reasonable jury to conclude that these

reasons are pretextual.  When viewed in the light most favorable to Price, Podell made a series of

remarks criticizing Price's visible manifestations of his increased Chabad religiosity leading up

to her decision to abandon the 80%-20% commission-splitting arrangement in March 2006.  A

reasonable jury could conclude that that abandonment was the result of an anti-Chabad sentiment

and that her explanation that no 80%-20% arrangement existed was pretextual.  As for

Reingold's management decision, if 20% of total commissions was the baseline compensation

that Price was entitled to earn, a reduction to percentages in the one to five percent range

represents a steep cut, one for which a "value added" rationale could reasonably be viewed as

pretext.  Price also points to a series of e-mails exchanged between Podell and Reingold that

show that the two collaborated in Reingold's decision.  In a series of e-mails exchanged on May

8, 2006, Reingold told Podell to "let [Price] arbitrate each [commission dispute] if he really

_____

[10] Because defendants did not offer legitimate, non-discriminatory reason for these actions in their brief, plaintiff also did not argue that any possible legitimate, non-discriminatory reason was pretextual.  (*See* Pl.'s Opp'n at 31 ("At the onset, it should be noted that defendants fail to offer *any* legitimate non-discriminatory motivation for Podell's abrogation of the Commission Agreement with Price, which led to his constructive discharge from her team.  Accordingly, defendants cannot hope to prevail on summary judgment with respect to this action.").)  Defendants' reply did purport to rely on their moving memorandum for arguments "that discriminatory animus played no part" in the commission-splitting dispute.  (Defs.' Reply at 7 (citing Defs.' Mem. at 26, 32-38).)  The sections covering the commission-splitting dispute, however, are focused on Price's retaliation claim and therefore argue not that discrimination played no part in Podell and Reingold's actions, but that Podell and Reingold were not aware of Price's complaints of discrimination when they took those actions.  (*See* Defs.' Mem. at 34-35.)  Those arguments do not apply to the question of whether the actions happened under circumstances giving rise to an inference of discrimination.  When the parties have simply ignored the second and third steps of the *McDonnell Douglas* burden-shifting framework, it is difficult for the Court to make a full evaluation of the strength of the parties' positions on those steps.

wants – unfortunately, time consuming for you."  (Moore Decl. Ex. 30.)  Podell replied that she

was "anxious and willing to fight this in an arbitration," but that "[u]nfortunately, you are right"

that the dispute was "already taking time."  (*Id.*)  On May 15, 2006, Podell e-mailed Reingold

asking if there was "[a]ny forward movement with Mark Price."  (Moore Decl. Ex. 27.)

Reingold told Podell that she had a "new idea" that was a "time saving thing."  (*Id.*)  On May 18,

2006, Reingold informed Price that she would make a management decision regarding the

commission splits.  (Price Decl. ¶ 66; *see also* Reingold Dep. at 172.)  Given the material issues

of fact as to whether discrimination was a factor in Podell's decision to abandon the 80%-20%

arrangement, summary judgment is not appropriate.

### iii. Termination

Price asserts timely claims for termination under federal and state law.  The only

contested part of Price's prima facie case is whether it occurred under circumstances giving rise

to an inference of discrimination.  Defendants contend that Price was terminated because of poor

performance as an independent broker and because of disruptive behavior.  (Defs.' Mem. at 39.)

Here, Reingold decided to terminate Price.  (*See* Harbert Dep. at 212 ("Q: Who made the

decision to terminate Mr. Price?  A: Suzy [Reingold].")  Harbert, Marano, and Reingold differ a

bit in their testimony regarding the reasons for Price's termination; Harbert denied that Price's

disruptiveness played any role in Price's termination, while Marano and Reingold both affirmed

that it did.  (*Compare* Reingold Dep. at 239 ("Q: Did Mr. M[a]rano say anything else about the

possible termination of Mr. Price?  A: I think he thought he was disruptive and that he kept

coming back.") *and* Marano Dep. at 183-84 *with* Harbert Dep. at 215 ("[H]e was not terminated

because he was disruptive.").)  Price's "disruptiveness," however, consists mainly of his

complaints about acts that he alleges were discriminatory when viewed in the light most

favorable to Price, and his claims regarding the discriminatory nature of the commission-splitting decisions of Podell and Reingold have survived summary judgment here.  Thus a reasonable jury could infer that the circumstances leading up to Price's termination were tinged with prohibited discrimination.  Although such events may give rise to a claim that sounds more in retaliation than discrimination, *see infra* Section IV.C, the Court cannot say at this juncture that a reasonable jury could not infer that either or both occurred.

### b.  City Law

As for Price's city-law claims, although defendants moved for summary judgment on those claims, they offered no argument addressing the independent liberal construction that must be afforded to the NYCHRL.  In particular, in contrast to state and federal law, the NYCHRL "eliminate[d] the requirement that an adverse employment action be *materially* adverse to the plaintiff."  *Joseph v. New York City Dep't of Corrections*, No. 10-CV-1265 (NGG)(LB), 2011 WL 1843162, at *9 (E.D.N.Y. May 13, 2011).  Defendants have offered no argument as to why the actions found above not to be adverse under state law are not adverse under this more liberal standard, and it is elementary that "[t]he burden of showing that no genuine factual dispute exists rests on the party seeking summary judgment."  *Nationwide Life Ins. Co. v. Bankers Leasing Ass'n, Inc.*, 182 F.3d 157, 160 (2d Cir. 1999).  Accordingly, Price's city-law claims based on those events survive.

### B.  Hostile Work Environment

Defendants next argue that they are entitled to summary judgment on Price's hostile work environment claim.  Under federal and state law, "[i]n order to prevail on a hostile work environment claim, a plaintiff must first show that 'the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working

environment . . . .'"  *Feingold v. New York*, 366 F.3d 138, 149 (2d Cir. 2004) (quoting *Alfano v.*

*Costello*, 294 F.3d 365, 373 (2d Cir. 2002)).  "The hostility or harassment must be on account of

his religion,"  *Leifer v. New York State Div. of Parole*, 391 F. App'x 32, 36 (2d Cir. 2010), and

"the plaintiff must demonstrate a specific basis for imputing the conduct creating the hostile

work environment to the employer."  *Feingold*, 366 F.3d at 150.  "The relevant inquiry focuses

on both objective and subjective hostility: 'A work environment will be considered hostile if a

reasonable person would have found it to be so and if the plaintiff subjectively so perceived it.'"

*Pucino*, 618 F.3d at 119 (quoting *Brennan v. Metro. Opera Ass'n*, 192 F.3d 310, 318 (2d Cir.

1999)).  "[T]he objective severity of harassment should be judged from the perspective of a

reasonable person in the plaintiff's position, considering 'all the circumstances.'"  *Oncale v.*

*Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998) (quoting *Harris v. Forklift Sys.*, 510

U.S. 17, 23 (1993)).  "These may include the frequency of the discriminatory conduct; its

severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and

whether it unreasonably interferes with an employee's work performance."  *Harris*, 510 U.S. at

23.

  Defendants argue that the actions involved in this case "in no way convey discriminatory

animus" and that "Price cannot establish he experienced any conduct that was sufficiently severe

or pervasive to constitute harassment."  (Defs.' Mem. at 30.)  The Court disagrees.  In this case,

Price has presented evidence that Podell, among other things: (1) described a Chabad practice as

"barbaric"; (2) ordered to Price to remove his *siddurs*; (3) told Price that he had to be "generic";

(4) became upset that Price discussed Chabad with a client from Singapore; (5) e-mailed Price on

Rosh Hashanah despite his request not to receive e-mails at that time; (6) complained about

Price's unshaven look despite knowing that it was a Jewish mourning practice; (7) prohibited

Price from attending morning prayers; (8) interrupted Price's *Kaddish* prayers despite his request

not to be interrupted during *Kaddish*; and (9) refused to allow Price to hang a *mezuzah* at his

desk even though brokers commonly kept personal items in view at their desks.[11]   All of these

events allegedly occurred in 2005 and 2006.   With all reasonable inferences drawn in Price's

favor, a reasonable jury could find that Podell was motivated by animus towards Price's Chabad

observances and that they were sufficiently severe or pervasive so as to alter Price's employment

conditions for the worse.   *See, e.g.*, *Leifer*, 391 F. App'x at 36 ("Leifer presents evidence of six

interactions with his supervisors over a three-year period which implicate his religion.   Viewing

Leifer's evidence in the light most favorable to him, a reasonable jury could find the interactions

to be sufficiently hostile to have altered his employment conditions for the worse.").   Neither

does the consideration of an e-mail in which Price wrote, "Yes, I love it here, despite some

min[o]r annoyances," necessarily compel a different conclusion.   (Burke Affir. Ex. T.)   A jury

could conclude that Price privately believed he was being harassed, and yet still sent an e-mail

showing a brighter public face.   Neither is defendants' argument that it is "significant" that Price

observed that "most of the people that are in real estate are Jewish" dispositive.   (Defs.' Mem. at

31 (quoting Price Dep. at 113)); *see Goldschmidt v. New York State Affordable Hous. Corp.*, 380

F. Supp. 2d 303, 317 (S.D.N.Y. 2005) ("[W]hile Drillings and Becker identify as Jewish, they do

not identify as Orthodox Jewish, do not observe Shabbat, and do not observe as many Jewish

holidays as Goldschmidt.   Even if considered members of the same general class—Jewish

individuals—there is no conclusive presumption that a person will not discriminate against

---

[11] This does not necessarily exclude consideration of other events, such as Podell's decision on commission splitting, as "[f]acially neutral incidents may be included, of course, among the 'totality of the circumstances' that courts consider in any hostile work environment claim," so long as a reasonable fact-finder could conclude that they were, in fact, based on membership in the protected class.   *See Alfano v. Costello*, 294 F.3d 365, 378 (2d Cir. 2002).

members of his or her own class.") (citing *Feingold*, 366 F.3d at 155).  Accordingly, Price's

hostile work environment claim survives.[12]

### C.  Failure To Accommodate

Defendants next move for summary judgment on Price's failure to accommodate claim

under state law.[13]  "[I]t is 'an unlawful employment practice . . . for an employer not to make

reasonable accommodations, short of undue hardship, for the religious practices of his employees

and prospective employees.'"  *Baker v. The Home Depot*, 445 F.3d 541, 546 (2d Cir. 2006)

(quoting *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 74 (1977)).  "[A]ll plaintiffs who

seek to make out a prima facie case of religious discrimination must show that '(1) they held a

bona fide religious belief conflicting with an employment requirement; (2) they informed their

employers of this belief; and (3) they were disciplined for failure to comply with the conflicting

employment requirement.'"  *Id.* (quoting *Knight v. Conn. Dep't of Pub. Health*, 275 F.3d 156,

167 (2d Cir. 2001)).  The third requirement has been equated with the requirement of an adverse

employment action.  *See Leifer*, 391 F. App'x at 33-34 ("[W]e agree with the district court that

Leifer's claim of discrimination based upon defendants' failure to accommodate his religious

practices fails because there is insufficient evidence showing that Leifer suffered an adverse

employment action."); *Bowles v. New York City Transit Auth.*, 285 F. App'x 812, 813-14 (2d Cir.

2008).  "Once a prima facie case is established by the employee, the employer 'must offer [him

or her] a reasonable accommodation, unless doing so would cause the employer to suffer an

undue hardship.'"  *Baker*, 445 F.3d at 546 (quoting *Cosme v. Henderson*, 287 F.3d 152, 158 (2d

Cir. 2002)).

---

[12] Because Price's hostile work environment claim survives under federal and state law, it also survives under the more liberal city law.

[13] Because Price bases his failure to accommodate claim on the Late Arrival Incident, it is time-barred under Title VII for the reasons discussed above.

Here, Price bases his failure to accommodate claim on defendants' "fail[ure] to provide Price with a reasonable accommodation of his request to attend the Chabad temple before work . . . ."  (Pl.'s Opp'n at 37-40.)  But as discussed above, Price's evidence regarding the Late Arrival Incident fails to show an adverse employment action; given that the "discipline" prong has been equated with an adverse employment action, it also fails to show that he has been disciplined for failure to comply with a conflicting employment requirement.  His state-law failure to accommodate claim, therefore, must be dismissed.

As with the state-law discrimination claims, however, defendants failed to offer any argument specific to the NYCHRL on this point.  Price's city-law claim therefore survives.

## IV. Retaliation

Defendants also move for summary judgment on Price's retaliation claims.[14]  "In adjudicating retaliation claims, courts follow the familiar burden-shifting approach of *McDonnell Douglas* . . . ."  *Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 552 (2d Cir. 2010).  To establish a prima facie case of retaliation, a plaintiff must show "(1) that she participated in an activity protected by Title VII, (2) that her participation was known to her employer, (3) that her employer thereafter subjected her to a materially adverse employment action, and (4) that there was a causal connection between the protected activity and the adverse employment action."  *Id.*  "Materially adverse" in the retaliation context means that the action "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal quotation marks omitted).  "Close temporal proximity between the plaintiff's protected action and the employer's adverse employment action may in itself be sufficient to establish the requisite causal connection

---

[14] As discussed above, all of Price's retaliation claims are time-barred under federal law except his claim based on termination.

between a protected activity and retaliatory action." *Kaytor*, 609 F.3d at 552.  "At the summary judgment stage, if the plaintiff presents at least a minimal amount of evidence to support the elements of the claim, the burden of production shifts to the defendant to proffer a legitimate non-retaliatory reason for the adverse employment action." *Id.* at 552-53.  "If the employer produces such evidence, the employee must, in order to avoid summary judgment, point to evidence sufficient to permit an inference that the employer's proffered non-retaliatory reason is pretextual and that retaliation was a substantial reason for the adverse employment action." *Id.* at 553 (internal quotation marks omitted).

Price claims retaliation based on: (1) Reingold's decision about the commission-splitting arrangement; (2) the denial of Price's request to arbitrate; (3) the move of Price to the eighth floor; and (4) Price's termination.[15]  (*See* Pl.'s Opp'n at 35.)  Defendants level several arguments against Price's retaliation claims.

---

[15] In their moving brief, defendants argued against retaliation claims based on eight acts.  (Defs.' Mem. at 32-39.)  Price, however, offers argument in opposition on only the four acts identified here.  (*See* Pl.'s Opp'n at 35-37.)  Accordingly, it appears that he has abandoned retaliation claims on the acts he does not identify.  *See Di Giovanna v. Beth Israel Med. Ctr.*, 651 F. Supp. 2d 193, 208 & n.108 (S.D.N.Y. 2009) ("Di Giovanna has offered no evidence that he ever opposed any alleged interference with his or anyone else's [Family and Medical Leave Act] rights.  Furthermore, he has made no attempt to rebut defendants' motion for summary judgment on this point.  Indeed his opposition papers do not even mention the claim.  Accordingly, Di Giovanna has abandoned this claim.").  Price does briefly allude to retaliation in his brief based on the denial of access to his files and on Cushman management "allow[ing] the situation to remain unresolved for several weeks."  (Pl.'s Opp'n at 17.)  Even if the Court were to consider these claims, they would be unmeritorious.  Although Price asserts that Podell "immediately . . . retaliated against Price by denying him access to his files" after he complained to Reingold, no clear indication of this chronology appears in the record.  (*Id.*)  Price's declaration asserts that he complained to Reingold some unspecified time after he submitted a May 3, 2006 memorandum to Reingold.  (*See* Price Decl. ¶ 65 ("After I submitted this memorandum, Reingold asked me to her office . . . .  I told Reingold that Podell was not only treating me unfairly with respect to the commissions, but had also discriminated against me, and had interfered with the mourning prayers for my son.").)  Podell's denial of access to files began earlier, on April 28, 2006.  (*See id.* ¶ 66 ("On April 28, 2006, Podell failed to release files in time for a meeting between me and [my] client.").)  Although an additional incident of file-access denial occurred on May 3, 2006 (the declaration states that it happened on May 3, 2009, but presumably this is a typographical error and not an indication that the incident occurred after the commencement of this lawsuit and Price's termination), it is unclear from Price's declaration whether this happened before or after his conversation with Reingold.  (*See id.* ¶¶ 64-66.)  As for Price's claim that Cushman retaliated by failing to investigate his complaints of discrimination, Second Circuit precedent is clear that "an employer's failure to investigate a complaint of discrimination cannot be considered an adverse employment action taken in retaliation for the filing of the same discrimination complaint."  *Fincher v. Depository Trust and Clearing Corp.*, 604 F.3d 712, 721 (2d Cir. 2010).

35

First, defendants argue that "Price has failed to prove that he engaged in protected activity—his very own statements and actions belying that he genuinely believed he was being discriminated against." (Defs.' Mem. at 32.) They argue that Price has failed to demonstrate that he had a "good faith, reasonable belief" that the conduct about which he complained violated the law because of his May 3, 2006 e-mail stating that he "loved it" at Cushman and because he did not mention discrimination or retaliation in certain complaints. (Id. (citing Wimes v. Kaleida Health, 157 F. App'x 327 (2d Cir. 2005),[16] and Neishlos v. City of New York, No. 00 Civ. 914 (SAS), 2003 WL 22480043, at *8 (S.D.N.Y. Nov. 3, 2003) ("Neishlos must demonstrate that he had a 'good faith, reasonable belief' that the underlying conduct violated the law." (quoting Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons, 842 F.2d 590, 593 (2d Cir. 1988))). Defendants' argument appears to be that conduct deviating from a pattern of voicing complaints of discrimination at every possible opportunity indicates that no reasonable jury could find that Price had a good faith, reasonable belief that defendants' conduct violated the law. Defendants cite no case law in support of that argument, and the Court cannot accept it. A reasonable jury could find that Price had a good faith, reasonable belief that defendants were illegally discriminating against him, and still not mention it at every opportunity he had to do so.

Second, for each of these acts, defendants contend that Price cannot show a causal connection between a complaint of discrimination and the action or overcome the legitimate, non-discriminatory reason offered for the act. These arguments are addressed below.

---

[16] The Court notes that Wimes is a summary order from the Second Circuit in 2005, and that Local Rule 32.1.1(b)(2) for the Second Circuit provides that "a party may not cite a summary order of this court issued prior to January 1, 2007," except in a subsequent stage of a case in which the summary order has been entered, or when cited as subsequent history. Thus its citation in this case is improper.

### A.  Reingold's Management Decision and Denial of Arbitration

Because Reingold's management decision and the denial of Price's alleged right to

arbitration are closely connected to each other, the Court considers them together.

Defendants argue that Reingold's commission-splitting decision cannot be a basis for a

retaliation claim because "Price admitted Reingold did not know of his alleged complaints of

discrimination."  (Defs.' Mem. at 35 (citing Price Dep. at 647-50).)  It is puzzling why

defendants contend that Price "admitted" that, though, considering that the cited portion of the

deposition transcript contains this exchange:

> Q: What did you tell Suzy [Reingold] about Joanne [Podell]'s alleged discriminatory act?
> A: I said to her, Joanne doesn't even allow me to pray in the morning, put the tefillin on
> to my son.

(Price Dep. at 650.)  Although Price did not get particularly specific about his charge of

discrimination, which happened in his meeting with Reingold some time after May 3, (*see id.* at

at 646-53; Price Decl. ¶ 65), he did complain about the Late Arrival Incident, and a reasonable

jury could find that Reingold therefore knew that Price complained of discrimination.

Defendants also contend that "Price has not presented any evidence" that Reingold's

decision "occurred as a result of him engaging in a protected activity."  (Defs.' Mem. at 35.)

Price relies on the temporal proximity between his complaint to Reingold, which happened

sometime after May 3, 2006, and Reingold's decision, which happened on June 16, 2006.  (Pl.'s

Opp'n at 35.)  Reingold's decision not to offer arbitration happened even earlier, on May 18,

2006, and the temporal connection is therefore even stronger there.  "[T]he Second Circuit 'has

not drawn a bright line to define the outer limits beyond which a temporal relationship is too

attenuated to establish a causal relationship between the exercise of a federal constitutional right

and an allegedly retaliatory action.'"  *Frisenda v. Inc. Vill. of Malverne*, 775 F. Supp. 2d 486,

512 (E.D.N.Y. 2011) (quoting *Gorman-Bakos v. Cornell Coop. Extension of Schenectady Cnty.*,

252 F.3d 545, 554 (2d Cir. 2001)).  But "courts in this Circuit have consistently held that a

passage of more than two months between the protected activity and the adverse employment

action does not allow for an inference of causation."  *Id.* (collecting cases).  And courts in this

Circuit have found delays of about six weeks to allow such an inference.  *See, e.g.*, *Memnon v.

Clifford Chance US, LLP*, 667 F. Supp. 2d 334, 345 (S.D.N.Y. 2009) ("The time elapsed

between this failure and the protected activity, approximately 6 weeks, could be seen as

sufficient to satisfy the causation prong of the *prima facie* claim."); *Khan v. Hip Centralized Lab.

Servs.*, No. CV-03-2411 (DGT), 2008 WL 4283348, at *4 (E.D.N.Y. Sept. 17, 2008) ("Khan sent

his letter to Ghirardi, complaining about his treatment in Client Services, about six weeks before

his suspension. This temporal proximity is sufficiently close to allow the jury to find that the

suspension was retaliatory . . . .").  Defendants' argument about the prima facie case therefore

fails.

Defendants offer as their legitimate, non-discriminatory reason that Reingold was

"exercising [Cushman's] right to decide whether to resolve the dispute internally or allow it to

proceed to arbitration, a right that is codified in [Cushman's] contract with its brokers."  (Defs.'

Mem. at 35.)  Whether that in fact is a "legitimate" reason, however, is also a subject of dispute,

as Price's employment contract does not appear to grant such a right.  *See infra* Section VI.B.

Additionally, even if that right existed, Price has adduced evidence indicating that

Reingold's resort to it was contrived; Reingold e-mailed Podell to tell her about her "new idea"

of using the management decision as a "time saving thing" to cut off further protests from Price

regarding Podell's abandonment of the 80%-20% arrangement.  (*See* Moore Decl. Ex. 30.)  From

the e-mails exchanged between Podell and Reingold, in conjunction with the temporal proximity

of Price's complaints of discrimination to Reingold's decisions to make a "management decision" and to affirm, in large part, Podell's decision to abandon the 80%-20% arrangement, when the evidence is viewed in the light most favorable to Price, a reasonable jury could infer that Reingold resorted to the "management decision" procedure motivated in part by retaliation for Price's complaints of discrimination.

### B.  Price's Move to the Eighth Floor

Defendants also contend that Price's move to the eighth floor does not constitute an adverse employment in the state and city law retaliation context. The Court agrees; case law has found that such a move does not constitute an adverse employment action under federal or state law.  *Cunningham*, 2010 WL 1781465, at *6 ("Although perhaps inconvenient, the relocation of plaintiff's office does not rise to level of an adverse employment action.  Even if the decision to move plaintiff to the first floor was the product of a retaliatory motive, plaintiff's complaints about his new office fall squarely within the class of trivial harms that the *Burlington* Court held Title VII was not intended to protect against.").  Price cites no authority holding otherwise.  As such, the Court need not consider this state-law claim any further.

As for Price's city-law claim, though, defendants also failed to offer argument specific to the NYCHRL with this claim as well.  It therefore survives.

### C.  Termination

Price's final retaliation claim rests on his termination.  Assuming that Price's claim suffices to make a *prima facie* case, his evidence is insufficient for a reasonable jury to find pretext in this case.  As discussed above, defendants have offered the legitimate, non-discriminatory reasons of poor performance and disruptiveness for Price's termination.  But viewed in the light most favorable to Price, that "disruptiveness" consisted of Price's complaints

39

regarding Podell's abrogation of the 80%-20% commission-splitting arrangement and Reingold's subsequent management decision siding substantially with Podell, both of which Price alleges were discriminatory.  A termination for "disruptiveness," then, could merely be code for a termination in retaliation for complaining of discrimination, and a reasonable jury could read that reason as mere pretext for a retaliatory motive.

## V. Policy Statement Breach-of-Contract Claim

Defendants next move for summary judgment on Price's breach-of-contract claim based on Cushman's "EEO/Harassment and Related Compliance Policies" (the "Compliance Policy"). (Moore Decl. Ex. 37.)  Price's claim is that Cushman discriminated and retaliated against him in violation of the Compliance Policy, which provides that Cushman shall, "[t]o the best of its ability, . . . [p]rovide a discrimination-free environment in which all employees can work without fear of intimidation or harassment because of their . . . religion . . . or any other basis prohibited by law," would "investigate[] thoroughly and promptly through, or under the supervision of, the Human Resources Department and when appropriate, in conjunction with the Legal Department or outside counsel" any reports of discrimination, and would not "tolerate[]" "[r]etaliation of any kind against an employee making a good faith complaint of discrimination." (*Id.*)

Under New York law, "[p]olicies in a personnel manual specifying the employer's practices with respect to the employment relationship, including the procedures or grounds for termination, may become a part of the employment contract." *Baron v. Port Auth. of New York and New Jersey*, 271 F.3d 81, 85 (2d Cir. 2001).  But to establish that such policies are a part of the employment contract, an employee alleging a breach of implied contract "must prove that (1) an express written policy limiting the employer's right of discharge exists, (2) the employer (or one of its authorized representatives) made the employee aware of this policy, and (3) the

employee detrimentally relied on the policy in accepting or continuing employment." *Id.* (citing *Lobosco v. New York Tel.*, 751 N.E.2d 462, 465 (N.Y. 2001)). This is a "difficult pleading burden," and "routinely issued employee manuals, handbooks and policy statements should not *lightly* be converted into binding employment agreements." *Id.* (emphasis in original).

Here, Price's claim is based on a generic anti-discrimination and retaliation policy statement. But "it is 'well-established that an employer's anti-discrimination policies and manuals cannot serve as the basis for a breach of contract claim.'" *Carmody v. Vill. of Rockville Ctr.*, 661 F. Supp. 2d 299, 340 (E.D.N.Y. 2009) (quoting *Davis v. Oyster Bay-East*, No. 03-CV-1372 (SJF)(JO), 2006 WL 657038, at *15 (E.D.N.Y. Mar. 9, 2006)); *see also Radin v. Albert Einstein Coll. of Med. of Yeshiva Univ.*, No. 04 Civ. 704 (RPP), 2005 WL 1214281, at *11 n.18 (S.D.N.Y. May 20, 2005) ("Plaintiff's breach of contract claims based on AECOM's anti-discrimination policy do not state valid claims because 'broad pronouncements of the University's compliance with existing anti-discrimination laws, promising equitable treatment of all students . . . cannot form the basis for a breach of contract claim.'" (quoting *Ward v. New York Univ.*, No. 99 Civ. 8733 (RCC), 2000 WL 1448641, at *4 (S.D.N.Y. Sept. 28, 2000))). Accordingly, this claim is dismissed.

## VI. Other Breach-of-Contract Claims

Defendants have moved for summary judgment on Price's breach-of-contract claims and his claim against Podell for unjust enrichment, arguing that (1) this Court lacks subject matter jurisdiction over claims relating to Price's commissions because of an arbitration clause; (2) his claims are meritless because Cushman exercised its contractual right to determine the amount of commissions Price received; and (3) Price failed to file a written demand for arbitration pursuant to the procedures outlined in the Schedule of Compensation.

41

**A. Scope of the Arbitration Clause**

The Court begins with defendants' contention that "[t]his Court lacks jurisdiction over Price's [commission claims] because they are governed by the arbitral process in Article VII(A) of the Schedule of Compensation attached to Price's Contract."[17]  (Defs.' Mem. at 41.)

> To determine whether a particular dispute falls within the scope of an agreement's arbitration clause, a court should undertake a three-part inquiry.  First, recognizing there is some range in the breadth of arbitration clauses, a court should classify the particular clause as either broad or narrow.  Next, if reviewing a narrow clause, the court must determine whether the dispute is over an issue that is on its face within the purview of the clause, or over a collateral issue that is somehow connected to the main agreement that contains the arbitration clause. Where the arbitration clause is narrow, a collateral matter will generally be ruled beyond its purview.  Where the arbitration clause is broad, there arises a presumption of arbitrability and arbitration of even a collateral matter will be ordered if the claim alleged implicates issues of contract construction or the parties' rights and obligations under it.

*Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.,* 252 F.3d 218, 224 (2d Cir. 2001) (internal citations and quotations omitted).

The arbitration clause at issue in this case reads as follows:

A.  Conditions to Arbitration:

> If a broker has a dispute with one or more other brokers, such broker shall make a good faith effort to resolve the dispute equitably.  If such effort is unsuccessful, such broker shall seek to have the dispute resolved with the assistance of the appropriate Branch Manager(s) or Regional Director(s). Every effort must be made to resolve the dispute at this level. . . .  Please note that these procedures do not apply to disputes between brokers and [Cushman].
>
> . . .

---

[17] It is unclear that this is actually a jurisdictional argument.  *See Xerox Corp. v. Arizona Digital Prods., Inc.*, No. 08-CV-6480 (CJS), 2009 WL 2992036, at *5 (W.D.N.Y. Sept. 15, 2009) ("[T]he right to arbitrate is an affirmative defense, that can be waived, while subject-matter jurisdiction can never be forfeited or waived." (internal quotation marks and citations omitted)).

C. Beginning the Process:

> All disputes that cannot be resolved under (A) above will be resolved though [sic] the process of binding arbitration as described herein. After all conditions to arbitration have been satisfied, the party demanding the arbitration must deliver a written notice to his Branch Manager (with a copy to his Regional Director, the General Counsel and the other disputant(s) stating the party's intent to seek arbitration and describing the dispute to be arbitrated.[18]

(Burke Affir. Ex. JJ at 5-6.)

The first question for the Court is whether the arbitration clause is narrow or broad.

Judge Koeltl addressed very similar language nine years ago in another one of Cushman's

contracts. This Court sees no distinction making a difference in the current language, and little

reason to disagree with the reasoning in that opinion:

> Broad arbitration clauses generally contain "very expansive language." This clause, however, is directed specifically to the limited issue of disputes between brokers. This clause does not contain any of the broad language often evident in broad arbitration clauses. The Employment Agreement deals separately with the rights between the plaintiff and her employer and there is no arbitration clause that relates to those disputes. Both parties retain all of their remedies at law and in equity to enforce the terms or obligations arising out of the Employment Agreement.

*Coffey v. Cushman & Wakefield, Inc.*, No. 01 Civ. 9447 (JGK), 2002 WL 1610913, at *7

(S.D.N.Y. July 22, 2002) (quoting *Louis Dreyfus*, 252 F.3d at 225) (internal citations omitted).

The inquiry then turns to "whether the dispute is over an issue that is on its face within

the purview of the clause, or over a collateral issue that is somehow connected to the main

agreement that contains the arbitration clause." *Louis Dreyfus*, 252 F.3d at 224. Because Price's

claims against Cushman "are against management, not fellow brokers," and the "arbitration

clause relates only to disputes between brokers," those claims "are not covered by the arbitration

---

[18] The section contains an unmatched parenthesis in the original document.

clause." *Coffey*, 2002 WL 1610913, at *7-8.  Accordingly, the arbitration clause does not cover

Price's claims against Cushman.

The arbitration clause could cover Price's claims against Podell, but the Court finds that

Podell has waived her right to arbitrate.  "[T]he right to arbitrate is an affirmative defense, that

can be waived . . . ." *Xerox Corp.*, 2009 WL 2992036, at *5 (internal quotation marks omitted);

*see also Nat'l Union Fire Ins. Co. of Pittsburgh, P.A. v. NCR Corp.*, 376 F. App'x 70, 71 (2d Cir.

2010) ("[A] party waives its right to arbitration when it engages in protracted litigation that

prejudices the opposing party.").  "In determining whether a party has waived its right to

arbitration by expressing its intent to litigate the dispute in question, we consider the following

three factors: '(1) the time elapsed from when litigation was commenced until the request for

arbitration; (2) the amount of litigation to date, including motion practice and discovery; and (3)

proof of prejudice.'"  *Louisiana Stadium & Exposition District v. Merrill Lynch, Pierce, Fenner*

*& Smith, Inc.*, 626 F.3d 156, 159 (2d Cir. 2010) (quoting *Louis Dreyfus*, 252 F.3d at 229).

"There is no bright-line rule, however, for determining when a party has waived its right to

arbitration: the determination of waiver depends on *the particular facts of each case.*"  *Nat'l*

*Union Fire Ins. Co.*, 376 F. App'x at 72 (emphasis in original).

In *Com-Tech Associates v. Computer Associates International, Inc.*, 938 F.2d 1574 (2d

Cir. 1991), for example, the Second Circuit found that the defendants had waived their right to

arbitrate where they "extensively deposed the plaintiffs," raised the question of arbitration for the

first time eighteen months after they answered the complaint, put plaintiffs "to the expense . . . of

defending motions for judgment on the pleadings and partial summary judgment," and made the

motion to compel arbitration when "discovery was nearly complete."  938 F.2d at 1576-78.

Here, defendants raised the issue of arbitration after discovery was complete and nearly two

years after they filed their motion to dismiss, did not move to compel arbitration, conducted

extensive deposition of Price (including deposition on his commission claims), and argued for

dismissal of Price's contract and quasi-contract claims in its motion to dismiss.  *See Price*, 2009

WL 3075599, at *3-7.  Under these circumstances, the Court finds that Podell has waived her

right to arbitrate, and therefore the arbitration clause fails to preclude Price's claims against her.

Defendants attempt to turn this argument on its head by casting the burden on Price,

arguing that "Price has waived any alleged right he had to arbitrate under his Contract because of

his delay in asserting it," and that defendants were under no "obligation to move to compel

arbitration nor were they required to proceed with such a motion to their detriment."  (Defs.'

Reply at 15.)  But it is defendants who seek here to dismiss Price's claims based on the

arbitration clause; they cite no authority for the novel proposition that a plaintiff who brings a

case for breach of contract for failure to arbitrate in accordance with contract procedures bears

the burden of moving to dismiss his own case in favor of arbitration, and the Court is aware of

none.  *Cf. WorldCrisa Corp. v. Armstrong*, 129 F.3d 71, 76 (2d Cir. 1997) (noting that the party

seeking a stay pending arbitration "bears the burden of demonstrating that such a stay is

justified").

### B.  The "Management Decision"

Defendants also claim that Price's contract claims must fail on the merits because they

were entitled under Price's employment contract (the "Contract") to subject the Price-Podell

commission-splitting dispute to a "management decision."  They base their argument on

paragraph 7 of the Contract, which reads, in relevant part:

> If any commissions or fees are determined to be due and [Cushman] personnel
> other than Employee contributed to or assisted in consummating any such
> transaction, . . . Employee shall abide by and accept [Cushman's] decision with

> respect to the determination of the amount of and the allocation of Employee's
> share in the commission or fee. . . .

(Burke Affir. Ex. R ¶ 7.)  Because Cushman, "through Reingold's management decision, applied the express terms of the Contract in determining the commissions due to Price and Podell," defendants argue that Price's claims that (1) Reingold's decision rendered him a commission split inconsistent with the implied covenant of good faith and fair dealing and that (2) Cushman breached his employment contract by denying him arbitration are both meritless.  (Defs.' Reply at 12.)

Under New York law, the elements of a breach-of-contract action are "(1) the existence of a contract, (2) the plaintiff's performance under the contract, (3) the defendant's breach of the contract, and (4) resulting damages."  *Palmetto Partners, L.P. v. AJW Qualified Partners, LLC*, 921 N.Y.S.2d 260, 264 (N.Y. App. Div. 2011).  Here, defendants claim that "Price's lawsuit is evidence that *he* was unwilling to abide by his obligations under his Contract, namely, accepting [Cushman's] determination of commissions once made."  (Defs.' Mem. at 43-44.)

But defendants' reading of the Contract is unwarranted.  The New York Court of Appeals has "long and consistently ruled against any construction which would render a contractual provision meaningless or without force or effect."  *Ronnen v. Ajax Electric Motor Corp.*, 671 N.E.2d 534, 536 (N.Y. 1996).  Thus "where two seemingly conflicting contract provisions reasonably can be reconciled, a court is required to do so and to give both effect."  *HSBC Bank USA v. Nat'l Equity Corp.*, 719 N.Y.S.2d 20, 22 (N.Y. App. Div. 2001).  Here, the commission-splitting dispute was one about commissions, which arguably brings it under the purview of paragraph 7 of the Contract, obligating Price to abide by Cushman's "decision."  But the dispute was one between Podell and Price, who are both brokers at Cushman.  Thus their dispute also falls under Section VII(C) of the Schedule of Compensation, which provides that all disputes that

46

cannot be resolved informally "will be resolved though [sic] the process of binding arbitration as described herein."  (Burke Affir. Ex. JJ.)

Defendants contend that the way to reconcile these provisions is to read paragraph 7 of contract to give Cushman, in essence, veto power over arbitration whenever issues of compensation are involved and that "[a]ny contrary reading of this provision in paragraph 7 would render it meaningless."  (Defs.' Reply at 13.)  But it is unclear why this is so.  That paragraph requires Price to "abide by and accept" Cushman's "decision," and a "decision" is "[t]he final and definite result of examining a question; a conclusion, judgement: *esp.* one formally pronounced in a court of law."  IV Oxford English Dictionary 332 (2d ed. 1991). Certainly arbitration is a way of reaching the "final and definite result of examining a question." And arbitration panels are composed of "brokers employed with a title of Director (or above) and who shall have been employed by [Cushman] for a minimum of five years," (Burke Affir. Ex. JJ), so it is difficult to see why the panel's decision might not reasonably be termed "Cushman's decision."  In short, nothing about paragraph 7 compels the conclusion that the Contract and the Schedule of Compensation must be read together to allow Cushman to preclude arbitration whenever commission decisions are involved, especially given "that ambiguities in contracts must be construed against the drafter."  *Guardian Life Ins. Co. of Am., Inc. v. Schaefer*, 519 N.E.2d 288, 289 (N.Y. 1987); *accord Essex Ins. Co. v. Laruccia Const., Inc.*, 898 N.Y.S.2d 558, 559 (N.Y. App. Div. 2010) ("[A]ny ambiguity must be construed against the . . . drafter of the policy.").

## C.  Written Demand for Arbitration

Defendants' last ground for summary judgment on Price's breach-of-contract claims is that Price failed to submit a formal, written demand of arbitration as specified in the Schedule of

Compensation.  (*See* Burke Affir. Ex. JJ § VII(C) ("[T]he party demanding the arbitration must deliver a written notice to his Branch Manager (with a copy to his Regional Director, the General Counsel and the other disputant(s) stating the party's intent to seek arbitration and describing the dispute to be arbitrated.").)  According to defendants, Price's failure to do so means that he "failed to satisfy the condition precedent to arbitration" and therefore cannot bring a breach-of-contract claim based on Cushman's refusal to arbitrate.  (Defs.' Reply at 13 & n.13.)  But it is a "long-standing principle of New York law that '[o]nce it becomes clear that one party will not live up to the contract, the aggrieved party is relieved from the performance of futile acts, such as conditions precedent.'"  *24/7 Records, Inc. v. Sony Music Entm't, Inc.*, 566 F. Supp. 2d 305, 313 (S.D.N.Y. 2008) (quoting *Allbrand Discount Liquors, Inc. v. Times Square Stores Corp.*, 399 N.Y.S.2d 700, 701 (N.Y. App. Div. 1977)); *see also Wolff & Munier, Inc. v. Whiting-Turner Contracting Co.*, 946 F.2d 1003, 1009 (2d Cir. 1991).  Here, Goldstein informed Price that Cushman had the option of making a management decision instead of submitting his commission-splitting dispute to arbitration, Reingold told Price that she would make a management decision, and Reingold in fact did so.  Under the circumstances, a reasonable jury could find that Cushman had made clear that it would not arbitrate and that it considered Reingold's management decision to preclude arbitration.  Defendants respond only that Cushman's "actions were at all times consistent with the language of its Contract with Price," an argument the Court has rejected above.  (Defs.' Reply at 14.)

Accordingly, Price's breach-of-contract claims against Cushman, except insofar as they are based on the Compliance Policy, and against Podell as well as his unjust enrichment claim against Podell survive.[19]

---

[19] Price appears, however, to have abandoned his New York Labor Law claims, which do not appear anywhere in his opposition despite defendants' arguments urging summary judgment on those claims.  *See, e.g.*, *McDonald v.*

## VII.   Jury Waiver

Defendants have also renewed their motion to strike Price's demand for a jury trial.  That motion is based on paragraph 10 of the Contract, which provides in relevant part:

> [Cushman] and Employee shall and hereby do waive a trial by jury in any action, proceeding or counter-claim brought or asserted by either of the parties hereto against the other on any matters whatsoever arising out of this Agreement.

(Burke Affir. Ex. R ¶ 10.)  The Seventh Amendment preserves the right to a jury trial for common-law actions, *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 41 (1989), but parties to a contract may waive that right "by prior written agreement entered into knowingly and voluntarily."  *Morgan Guar. Trust Co. v. Crane*, 36 F. Supp. 2d 602, 603 (S.D.N.Y. 1999).  Nevertheless, because the right is "fundamental," the presumption is against waiver, courts construe contract waiver provisions "narrowly," and "the requirement of knowing, voluntary, intentional waiver is strictly applied."  *Id.*  Whether waiver is knowing and voluntary is determined as a matter of federal law.  *See Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 188 (2d Cir. 2007).  Courts use the following factors in deciding whether a waiver is enforceable: "1) the negotiability of contract terms and negotiations between the parties concerning the waiver provision; 2) the conspicuousness of the waiver provision in the contract; 3) the relative bargaining power of the parties; and 4) the business acumen of the party opposing the waiver."  *Morgan*, 36 F. Supp. 2d at 604; *see Sullivan v. Ajax Navigation Corp.*, 881 F. Supp. 906, 911 (S.D.N.Y. 1995).  "The burden of proving that a waiver was knowing and intentional rests with the party attempting to enforce the purported waiver."  *Sullivan*, 881 F. Supp. at 910.

---

*City of New York*, --- F. Supp. 2d ----, 2011 WL 1331504, at *20 (E.D.N.Y. Apr. 6, 2011) ("By neglecting to respond to defendants' arguments in his opposition, it therefore appears that plaintiff has withdrawn or abandoned this claim making it ripe for dismissal."); *Adams v. New York State Educ. Dep't*, 752 F. Supp. 2d 420, 452 n.32 (S.D.N.Y. 2010); *Newton v. City of New York*, 738 F. Supp. 2d 397, 416 n.130 (S.D.N.Y. 2010) ("Newton did not respond to defendants' motion to dismiss his claim against the *City* for Ryan's wrongdoing in his Opposition Brief, and therefore abandoned his claim." (emphasis in original)).

The first factor weighs in favor of defendants.  The Eastern Group was represented by counsel during negotiations, and Price managed to negotiate a side letter and attempted to negotiate an expense account.  And "[t]he fact that a contract term was negotiable at the time the contract was being contemplated, even if the term itself was never specifically negotiated, suggests that subsequent consent to such term was knowing and voluntary."  *Wechsler v. Hunt Health Sys.*, No. 94 Civ. 8294(PKL), 2003 WL 21878815, at *3 (S.D.N.Y. Aug. 8, 2003).

The second factor, conspicuousness, weighs in favor of neither party.  "Factors to consider when making this determination include: the placement of the waiver, *i.e.* whether the provision was buried in a multitude of words, the size and style of the print, and the location of the provision within the entire document."  *Wechsler*, 2003 WL 21878815, at *5.  Here, the waiver appears somewhere in the middle of the Contract, in the tenth numbered paragraph of fifteen therein.  The waiver is the last sentence of a three-sentence paragraph, and appears in the same typeface as the surrounding text.  It is not set off by capitalization, a paragraph heading, or bolded text, but neither is any other part of the Contract.  In short, the clause appears just like every other one in the Contract, and neither distinguishes itself nor conceals itself when compared to the surrounding text.

The third and fourth factor, relative bargaining power and business acumen, favor Price, but only slightly.  Price was a broker with less than three years experience at the time he signed the Contract, while Cushman is a "world-wide commercial real estate services firm."  (Defs.' Rule 56.1 Stmt. ¶ 1.)  Also, Price's experience prior to signing the Contract consisted only of being a pharmacist and two to three years of experience as a junior broker at Eastern; he lacks the extensive business training or experience found in other cases to constitute the business acumen weighing in favor of enforcing the waiver.  At the same time, Price was part of the

Eastern Group, which included senior brokers, and which was represented by a partner at a major law firm.  Under such circumstances, these factors are less probative of whether Price's waiver was knowing and voluntary than they would be if he was unrepresented and acting alone in negotiating his employment contract.

On balance, the factors tilt in favor of the defendants; enforcing the jury waiver here merely recognizes the bargained-for agreement into which Price entered knowingly and voluntarily.  That waiver applies to both Price's contractual claims and his discrimination claims. *See Brown v. Cushman & Wakefield, Inc.*, 235 F. Supp. 2d 291, 293-94 (S.D.N.Y. 2002) (holding that identical jury-waiver clause applied both to discrimination claims and to contractual claims).

Price further argues, however, that his jury demand cannot be stricken as against Podell because she is not a signatory to the contract.[20]  This question is resolved under federal law.  *See Tracinda Corp. v. DaimlerChrylser AG*, 502 F.3d 212, 222 (3d Cir. 2007) ("Federal courts apply federal law in determining whether a contractual jury trial waiver is enforceable."); *Adelphia Recovery Trust v. Bank of America, N.A.*, No. 05 Civ. 9050 (LMM), 2009 WL 2031855, at *3 (S.D.N.Y. July 8, 2009) ("The right to a jury trial in an action commenced in federal court is determined as a matter of federal law.").

Podell argues that she should be afforded the benefit of the jury-waiver provision because "[u]nder New York contract law, non-signatories, such as Podell, are considered third-party beneficiaries under traditional principles of contract and agency law and are entitled to the contract's benefits."  (Defs.' Mem. at 49.)[21]  This argument is, of course, technically incorrect, as federal law, not New York contract law resolves the question of whether Podell can invoke the

---

[20] In his opposition, Price offered one sentence of argument on the topic, contending that Podell's status as non-signatory *per se* prohibited her from invoking the jury waiver.  (Pl.'s Opp'n at 50.)
[21] Defendants ignore the jury-waiver issue in their reply.

jury-waiver clause at issue here.  And the case that Podell cites for this proposition, *Hirschfeld*

*Productions, Inc. v. Mirvish*, 673 N.E.2d 1232 (N.Y. 1996), actually applied federal law to the

question presented there, which was whether the president and chairman of a Canadian theatrical

production company could invoke an arbitration clause.  673 N.E.2d at 1233 ("Inasmuch as the

dispute involves an international commercial contract, it is governed by the Federal Arbitration

Act and Federal law.").  Indeed, the only two cases cited by Podell in support of her argument,

*Hirschfeld* and *Kanoff v. Better Life Renting Corp.*, Civ. No. 03-2363 (FLW), 2008 WL 442145,

at *3-6 (D.N.J. Feb. 14, 2008), both deal with arbitration clauses.  Podell does not explain why

the arbitration cases are applicable to this case in light of the apparent tension between the

federal policy resolving "doubts concerning the scope of an arbitration clause . . . in favor of

arbitration," *Applied Energetics, Inc. v. NewOak Capital Markets, LLC*, 645 F.3d 522, 526 (2d

Cir. 2011), whereas there is "a presumption against waiver of one's right to a jury trial," *Wright*

*v. Lewis*, 76 F.3d 57, 60 (2d Cir. 1996).

The case that appears to be most on point, cited in the Court's previous opinion, 2009

WL 3075599, at *7, but curiously unaddressed by the parties in this motion, is the Third

Circuit's decision in *Tracinda Corp. v. DaimlerChrysler AG*.  There, the Third Circuit

considered the question of "whether a valid contractual jury waiver provision, which applies to a

signatory corporation, will also apply to a nonsignatory officer acting as an agent of the signatory

corporation."  502 F.3d at 222.  Reasoning that "[i]f we did not allow nonsignatory agents of a

signatory corporation to invoke a valid contractual jury waiver provision, such an agreement

would be of little practical value, as it would be too easy to circumvent the agreements by

naming individuals as defendants instead of the entity," the court concluded that "when a valid

contractual jury trial waiver provision applies to a signatory corporation, the waiver also applies

to nonsignatory directors and officers seeking to invoke the waiver as agents of the corporation." *Id.* at 225.  The court distinguished the Ninth Circuit's decision in *Paracor Finance, Inc. v. General Electric Capital Corp.*, 96 F.3d 1151, 1167 (9th Cir. 1996), on the grounds that the "nonsignatory third-party financier and its CEO" involved in that case were clearly not agents of the signatory principal.  *Tracinda*, 502 F.3d at 225.

In arriving at its conclusion, the *Tracinda* court derived its rule from arbitration cases applying the law of agency, particularly relying on the Third Circuit's prior decision in *Pritzker v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 7 F.3d 1110, 1115 (3d Cir. 1993).  It acknowledged that there was a "tension between the cases favoring arbitration clauses and those disfavoring jury waivers," but nevertheless imported the principle of *Pritzker* into its reasoning because "traditional agency principles of who is bound by an agreement—and not the [Federal Arbitration Act]'s favoring of arbitration over a jury trial— . . . determined who was bound by the agreement to arbitrate."  *Tracinda*, 502 F.3d at 223.  Applying the "well-settled" rule "that nonsignatory agents may invoke a valid arbitration agreement entered into by their principal," the court found that the nonsignatory officer could invoke the arbitration clause.  *Id.* at 223-25.

*Tracinda* seems fully applicable to this case.  If the Court did not allow Podell to invoke the jury waiver, then Price could circumvent the waiver by suing the individuals alleged to have discriminated against him instead of Cushman.  And although *Tracinda* involved a high-level officer, the case from which it derived its rule, *Pritzker*, did not.  *See Pritzker*, 7 F.3d at 1112, 1121 (finding that a financial consultant could invoke an arbitration clause to which she was a non-signatory and noting that "[b]ecause a principal is bound under the terms of a valid arbitration clause, its agents, employees, and representatives are also covered under the terms of such agreements").  Accordingly, Podell can also invoke the jury waiver.

## VIII.   Attorney's Fees

Finally, defendants argue that should they "prevail on any of Price's above claims, Defendants are entitled to their legal fees, costs, and expenses incurred in the defense of those claims," under paragraph 10 of the Contract.  (Defs.' Mem. at 49-50.)  That paragraph provides:

> In the event any legal action or proceeding is commenced to interpret or enforce the terms of or obligations arising out of this Agreement, or to recover damages for the breach thereof, the party prevailing in any such action or proceeding shall be entitled to recover from the non-prevailing party all reasonable legal fees, costs and expenses incurred by the prevailing party.

(Burke Affir. Ex. R ¶ 10.)  That paragraph, however, refers to an "action" or "proceeding."  An "action" is "[a] civil or criminal judicial proceeding," and a "proceeding" is "[t]he regular and orderly progression of a lawsuit, including all acts and events between the time of commencement and the entry of judgment."  Black's Law Dictionary 32, 1324 (9th ed. 2009). As some of Price's claims survive, no party has "prevailed" in this action yet, and an award of attorney's fees is inappropriate.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment **[46]** is GRANTED in part and DENIED in part.

Price's Title VII discrete-act claims of disparate treatment and retaliation, except insofar as they are based on his termination, are dismissed as untimely.

Price's disparate-treatment claims based on the commission-splitting decisions and his termination, his hostile work environment claim, and his retaliation claim based on Reingold's management decision survive under state and city law.

Price's state-law disparate-treatment and retaliation claims based on other events, as well as his failure to accommodate claim are dismissed, but his city-law claims based on those events survive.

Price's breach-of-contract claims based on his employment contract, as well as his breach-of-contract and unjust enrichment claims against Podell, survive.  Price's breach of contract claim based on the Compliance Policy is dismissed.

Defendants' motion to strike Price's jury demand is GRANTED.  The motion for attorney's fees is DENIED.


SO ORDERED.

Dated: New York, New York
       September **2**, 2011

_____
Richard J. Holwell
United States District Judge

55